[No. 34454. Department Two. January 22, 1959.]

CONVOY COMPANY, *Appellant*, v. DINSMORE TAYLOR *et al.*, *Respondents.*[1]

*Kellogg, Reaugh & Hart* and *George H. Hart*, for appellant.

*The Attorney General* and *Robert L. Simpson, Assistant*, for respondent.

WEAVER, C. J.—Plaintiff appeals from a judgment that (a) dissolves a temporary order restraining the tax commissioners of the State of Washington from collecting certain taxes from plaintiff, and (b) dismisses plaintiff's complaint with prejudice.

[1]Reported in 334 P. (2d) 772.

RCW 82.16.020 imposes the tax involved.

"There is levied and there shall be collected from every person a tax for the act or privilege of engaging within this state in any one or more of the businesses herein mentioned. The tax shall be equal to the gross operating revenue of the business, multiplied by the rate set out after the business, as follows:

" . . .

"(5) Highway transportation and all public service businesses other than ones mentioned above: One and one-half percent."

A surtax is added by RCW 82.16.025-026.

The facts are not in dispute.

Plaintiff, an Oregon corporation qualified to do business in this state, is a common carrier, by motor vehicle, of new automobiles and other motor vehicles in interstate and intrastate commerce. Its interstate operations are conducted pursuant to a certificate of public convenience and necessity issued by the interstate commerce commission; its Washington intrastate operations are conducted under authority of a common-carrier permit issued by the Washington public service commission.

The Ford Motor Company maintains an assembly plant in Richmond, California, from which it supplies cars to its dealers in western states, including Washington. A Washington dealer submits an order, to Ford's district sales representative in Seattle, designating the model and specifications of the automobile desired. These orders, assembled in the sales office, are forwarded to the Ford assembly plant in California. As soon as the body is placed on the chassis, the dealer's name is placed on the windshield of the ordered unit and is attached to the automobile throughout the process of its assembly. The completed unit is shipped to the dealer by various methods of transportation. We note two of them.

The stipulated statement of facts states:

"In the case of cars shipped by rail to Seattle for dealers located within the city limits of Seattle, the Ford Motor Company pays the rail freight to Seattle and the Seattle dealer pays plaintiff for unloading the vehicle from the rail car and delivering it to the dealer's place of business in

Seattle. In computing its public utility and business and occupation tax for the period involved, plaintiff treated the revenue received by it from the Seattle dealers for the unloading and delivery of their cars to their place of business in Seattle as revenue derived from 'urban transportation' and paid the appropriate tax with respect thereto.

"None of the revenue earned by plaintiff during the period in question from such operations is included in the disallowed deduction of $583,388.23, nor does plaintiff here contend that the tax paid by it with respect to such revenue and operations was improperly paid."

The tax involved in this case arises from the following method of transportation of Ford automobiles: The ordered automobiles are loaded in a railroad car at Richmond, California. The Ford Motor Company, as consignor, prepares a non-negotiable, uniform, straight bill of lading with itself, "Ford Motor Co. c/o Convoy Co., Seattle, Wn." as consignee. The bill of lading contains a detailed description of each vehicle, together with the name of the ordering dealer and the city in which he is located.

The Ford traffic manager testified that this method was used to "protect the Ford Motor Company in two ways,"

"Should we wish to refuse delivery to a dealer, which is possible after the unit had moved forward from Richmond, . . . the dealer could not receive the goods unless he paid with a bank draft."

And,

" . . . with a Ford bill of lading, we attempted to get that protection because in assigning it to Ford Motor Company we held control of the vehicle and the field officers felt that in the event of a bankruptcy or attachment of the car or judgments, there could be a very slight possibility that they could have our units tied up with a lien . . ."

At the same time, Ford Motor Company prepared invoices for each dealer showing his location, the type and model of vehicles, and the total charges to be collected upon delivery of the vehicle.

The Ford Motor Company forwarded the bills of lading and dealer invoices to plaintiff. Upon arrival of the rail car at plaintiff's spur track in Seattle, plaintiff unloaded the

automobiles; prepared freight bills to cover the truck portion of the movement, at rates stated in the company's interstate tariff; loaded the units on its truck equipment; and delivered the designated motor vehicles to the respective Ford dealers, as shown on the original bill of lading. No joint through-rates were in effect for rail-truck shipments of motor vehicles between the geographic points involved. The Ford Motor Company paid both the rail and truck transportation charges.

Plaintiff's revenues, upon which defendants have assessed a tax, pursuant to RCW 82.16.020, were derived from the transportation of new automobiles for the Ford Motor Company from Seattle, Washington, to other Washington cities.

 The trial court's ultimate conclusion—that the tax imposed by RCW 82.16.020 on plaintiff's gross operating revenue derived from its transportation of automobiles from its spur track siding in Seattle to Ford dealers within the state of Washington does not contravene the limitations of the commerce clause of the Federal constitution—is sustained by either of two reasons: plaintiff's operation is purely one of intrastate commerce; or, the tax is not an invalid imposition on interstate commerce in the circumstances of the instant case.

Diligence of counsel has directed our attention to a multitude of decisions in which the questions presented are discussed. To analyze all of the authorities would not clarify the situation, for, after reviewing them, we are impressed with the fact that

"The wording of a judicial declaration of the precise line that marks the change from intrastate movement to interstate movement has been difficult." (Dis. op.) *Interstate Oil Pipe Line Co. v. Stone*, 337 U. S. 662, 672, 93 L. Ed. 1613, 69 S. Ct. 1264 (1949).

That plaintiff's operation in the state of Washington, as we have described it, is intrastate commerce, is sustained by the recent decision of the supreme court of Mississippi in *McKeigney v. Dunn Brothers, Inc.* (originally *Stone v. Dunn Brothers, Inc.*), 224 Miss. 762, 80 So. (2d) 802; 224 Miss. 777, 81 So. (2d) 712 (1955).

Tennessee Gas Transmission Company, which was laying a pipeline in Mississippi, purchased pipe in California. The Transmission Company, as consignor, shipped the pipe by railroad to itself, as consignee, for delivery at various railheads or depots in Mississippi. Bills of lading were issued accordingly. The Transmission Company had contracted with Dunn Brothers, a motor carrier operating under a certificate from the interstate commerce commission, to deliver the pipe from the depots to various points within the state.

When the shipment arrived at its destination, the Transmission Company, by an agent, inspected it for damage in transit. Dunn Brothers then took possession of the shipment from the railroad and delivered it as instructed. The court held that "[t]his was, in effect, a delivery to the Transmission Company. The interstate journey was then at an end."

Mississippi assessed a two per cent tax, similar to the tax in the instant case, against Dunn Brothers' gross income realized from the operation described. The tax was held to be valid. The court said:

". . . It is only for the carriage within Mississippi that the tax is demanded. A local drayman or an intrastate carrier would have been obliged to pay the tax here demanded. If, under the circumstances of this case, appellee should prevail, then by reason of its claim of interstate commerce, it would escape the burdens which fall on its competitors in intrastate commerce. Evidently equality for, not favoritism to, interstate commerce was the underlying purpose of Article I, Section VIII, cl. 3, of the U. S. Constitution."

The court concluded:

"So, the service by Dunn Brothers in carrying the pipe, after its acceptance by the Transmission Company, from the depot or railhead in Mississippi to the right of way also in Mississippi, was an activity wholly within the State of Mississippi, *was therefore intrastate*, and the gross income therefrom was subject to the tax of two per cent. However if it may be said that this was a fringe situation and therefore uncertain, nevertheless the appellee is still liable for this tax as a recompense for the protection which it was afforded by the state as it engaged in this activity. Thus, for

both reasons, as above stated, the tax was properly assessed and collected. . . . " (Italics ours.)

On appeal to the United States Supreme Court, the *Dunn Brothers'* case was dismissed for "want of a substantial federal question." 350 U. S. 878, 100 L. Ed. 775, 76 S. Ct. 139 (1955).

We note that the Mississippi court alluded to a conclusion similar to our second reason for deeming the tax a valid one in the instant case—that it is not an invalid imposition on interstate commerce.

Support for this conclusion is found in the rationale expressed in *Interstate Oil Pipeline Co. v. Stone*, 337 U. S. 662, 93 L. Ed. 1613, 69 S. Ct. 1264 (1949), and cases cited. The facts are adequately set forth in the syllabus of the opinion, as follows:

"Appellant owns and operates pipe lines used to transport oil from lease tanks to railroad loading racks in Mississippi. Delivery of the oil to appellant by the owner is accompanied by instructions for shipping it interstate. The oil is pumped from the loading racks into railroad tank cars; and, if no tank cars are available, it is stored, but never longer than a week. In the bills of lading, which covered only the rail shipment, the owner is designated as shipper and appellant as his agent, and the out-of-State destination is indicated. Mississippi levied against appellant a tax measured by appellant's receipts from the transportation of the oil from the lease tanks to the loading racks."

A majority of the court held that the tax was valid. Mr. Justice Rutledge, with whom three other members of the court agreed, said:

"We do not pause to consider whether the business of operating the intrastate pipe lines is interstate commerce, for, even if we assume that it is, Mississippi has power to impose the tax involved in this case. . . .

" . . .

"The statute is not invalidated by the commerce clause of the Federal Constitution merely because, unlike the statute attacked in *Memphis [Natural] Gas. Co. v. Stone, supra* [335 U. S. 80], it imposes a 'direct' tax on the 'privilege' of engaging in interstate commerce. Any notions to the contrary should not have survived *Maine v. Grand Trunk R.*

Co., 142 U. S. 217, which flatly rules the case at bar. That case sustained a state statute which imposed upon an interstate railroad corporation 'an annual excise tax [measured by apportioned gross receipts], for the privilege of exercising its franchises in this State.' The *Grand Trunk* decision has been approved by this Court as recently as the other controlling case of *Central Greyhound Lines [Inc.] v. Mealey*, *supra*, [334 U. S. 653] at 658, 663, in which the Court permitted New York to impose a tax on the gross receipts from the operation of an interstate bus line, provided that tax was apportioned according to mileage traveled within the state."

The concluding paragraph of Mr. Justice Rutledge's opinion is of particular significance to the case before us.

"Since all the activities upon which the tax is imposed are carried on in Mississippi, there is no due process objection to the tax. The tax does not discriminate against interstate commerce in favor of competing intrastate commerce of like character. The nature of the subject of taxation makes apportionment unnecessary; there is no attempt to tax interstate activity carried on outside Mississippi's borders. No other state can repeat the tax. For these reasons the commerce clause does not invalidate this tax."

Mr. Justice Burton concurred in the result on the ground that the tax was levied against intrastate commerce.

We conclude, therefore, that the judgment must be affirmed.

It is so ordered.

HILL, DONWORTH, ROSELLINI, and FOSTER, JJ., concur.

March 19, 1959. Petition for rehearing denied.