[No. 36466. En Banc. January 16, 1964.]

ST. REGIS PAPER COMPANY, *Appellant*, v. THE STATE OF WASHINGTON *et al., Respondents.*\*

*Reported in 388 P. (2d) 520.

 

*Grosscup, Ambler, Miller & Lawrence, Ben C. Grosscup,*
and *Wilbur J. Lawrence,* for appellant.

*The Attorney General, John W. Riley, Special Assistant,*
and *James A. Furber, Assistant,* for respondents.

HALE, J.—Is money received by a manufacturer in over-
payment of freight, on lumber and plywood sold and
shipped to buyers outside the state, a part of the gross
proceeds of such sales?

The state imposes a business and occupation tax on
manufacturing. On manufactured articles sold and de-
livered within the state, the tax applies to either whole-
saling (RCW 82.04.270) or retailing (RCW 82.04.250). If
the articles are sold and delivered outside the state, the
tax is upon manufacturing (RCW 82.04.240).

St. Regis Paper Company manufactures plywood, lum-
ber and other forest products in Washington, which it sells
within and outside the state. It issues two separate price
lists for its products, one covering sales for delivery within
the state, which are f.o.b. the mill, and the other for products
to be delivered outside the state. The price list for delivery
outside the state, unlike that for delivery intrastate, is f.o.b.
at point of delivery and includes, as a separate item, the esti-
mated freight costs from point of manufacture to point of
delivery.

Lumber, plywood and similar forest products are sold by
board foot measure; freight charges are made by weight.
Nearly everyone in the railroad and lumbering industries
knows that accurate weights cannot be predicted, even for
products of the same grades and quantities, because of
minute differences in each shipment. Different shipments
of the same product will differ in weight because of vari-
ances in density, age, moisture content and other factors.

Thus, the true or actual freight charges cannot be ascertained until the products are loaded and delivered to the railroad for actual weighing upon the scales. In nearly every instance, the estimated freight charges on out-of-state shipments, to be paid by the consignee, exceed the actual freight charges. The purchaser pays to St. Regis the list price of the products according to its out-of-state price lists, plus the estimated freight charges as computed by St. Regis—this in accordance with the universally accepted custom of the lumbering business. St. Regis retains —in pursuance of this custom—the difference between the estimated freight costs and the actual freight charges. These differentials are known in the business as *underweights*.

The following table, offered as an example only, illustrates the revenue (based on one carload) derived from underweights in four sample shipments to different destinations from Tacoma:

| To | Rate Per 100 lbs. | Actual Weight | Estimated Freight | Actual Freight | Underweight Revenue |
|---|---|---|---|---|---|
| New York | $1.48 | 63,960 | $1,143.22 | $946.61 | $196.61 |
| Montana | .76 | 63,960 | 589.20 | 486.10 | 103.10 |
| Indiana | 1.48 | 51,280 | 897.13 | 758.94 | 138.19 |
| Montana | .76 | 51,280 | 462.63 | 389.73 | 72.90 |

In computing the tax on the privilege of manufacturing, the Tax Commission included the underweight revenues as a part of the gross proceeds derived from the sale of manufactured products under the following sections of the revenue act:

". . . the amount of the tax with respect to such business shall be equal to the value of the products, including byproducts, manufactured, multiplied by the rate of one-quarter of one percent.

"The measure of the tax is the value of the products, including byproducts, so manufactured regardless of the place of sale or the fact that deliveries may be made to points outside the state." RCW 82.04.240.

"The value of products, including byproducts, extracted or manufactured shall be determined by the gross proceeds derived from the sale thereof whether such sale is at wholesale or at retail, to which shall be added all subsidies and

bonuses received from the purchaser or from any other person with respect to the extraction, manufacture, or sale of such products or byproducts by the seller, except:

"(1) Where such products, including byproducts, are extracted or manufactured for commercial or industrial use;

"(2) Where such products, including byproducts, are shipped, transported or transferred out of the state, or to another person, *without prior sale* or are sold under circumstances such that the gross proceeds from the sale are not indicative of the true value of the subject matter of the sale.

"In the above cases the value shall correspond as nearly as possible to the gross proceeds from sales in this state of similar products of like quality and character . . . plus the amount of subsidies or bonuses ordinarily payable by the purchaser . . ." (Italics ours.) RCW 82.04.450.

In this fashion, the state seeks to tax the revenues, as shown in the above table in the right-hand column, as a part of the gross proceeds of sales received from the manufacturing process. St. Regis contends that the revenue act does not include such revenues as a part of the gross proceeds from sales of manufactured products, and if it did it would constitute an unconstitutional burden on interstate commerce. Accordingly, it brings this action against the State Tax Commission for a refund of such amounts of the manufacturing taxes as were based upon the underweights. Issues were framed by stipulation.[1]

St. Regis points to its contracts of sale with its customers as taking the underweights out of the revenue act because title to the products shipped does remain in St. Regis until delivery to *and* acceptance by the buyer; and payment of the freight charges is a part of the act of acceptance. It reads the statute as meaning that no sale takes place until there has been a transfer of either ownership, title or possession, and argues that, under the statutory definition of

---

[1]By pretrial order and stipulation, the issue was stated as follows:

". . . whether or not the sum of $1,561.31 or 3.5% on interstate sales of lumber and 1.28% on interstate sales of plywood, plus audit interest on $71.23, included in the assessment with which this appeal is concerned, is properly includable in the 'measure' of the 'manufacturer's' tax as stated by RCW 82.04.240."

sale, the incident upon which the tax has been computed does not occur *until after* acceptance and, thus, is not a part of the revenue derived from manufacturing. Accordingly, it is said, since the transfer of ownership, or title, or possession, does not take place until after acceptance, the products are in fact shipped to the customer *without* a prior sale of the goods to the customer.

Appellant's argument omits what seems to us to be an integral clause in the above exception, which is that the exception applies if the product is shipped or transported out of the state *without prior sale.* Then and then only will the gross proceeds from it be computed at the same rate of other similar products sold in the state, to which shall be added, of course, any bonuses or subsidies paid by the purchaser.

This exception, we think, is designed to cover the many transactions that do not yield readily to classification as a sale of products, such as exchanges of products, or shipment of products by a company to its subsidiary out of the state for further manufacture or fabrication, or exchanges of products for services where the value of the products to the manufacturer cannot be readily measured. In transactions of this character, the exception (2) would necessarily apply because there would then be *no prior sale* within the state. In the instant case, the shipment is made pursuant to a prior sale. The moment when title or possession or ownership transfers is immaterial, for the transaction comes within the revenue act's definition of a sale when the out-of-state order is filled and shipped.

St. Regis's understanding of what constitutes a sale is derived from only a part of the revenue act's definition. The term "sale," as used in the revenue act, is broad enough to and does, we think, include the out-of-state shipments before delivery and acceptance.

" 'Sale' means any transfer of the ownership of, title to, or possession of property for a valuable consideration and includes any activity classified as a 'sale at retail' or 'retail sale' under RCW 82.04.050. It includes renting or leasing, conditional sale contracts, leases with option to purchase,

and any contract under which possession of the property is given to the purchaser but title is retained by the vendor as security for the payment of the purchase price. . . ." RCW 82.04.040.

■ Accordingly, when St. Regis, in response to a purchase order, loads a boxcar with its products and sends it on its way to the purchaser, it has made a sale to the purchaser within the revenue acts of the state without regard to the point at which title, or ownership, or possession would be said to pass in other fields of law.

The term "sale" also must be considered in connection with gross proceeds. RCW 82.04.220 applies the business and occupation tax upon the value of the products, gross proceeds of sales, or gross income, as the case may be. We are concerned with the gross proceeds of sales and, in aider, we look to RCW 82.04.450, which declares that the value of the products shall be determined by the gross proceeds derived from their sale, whether at wholesale or retail, including all subsidies and bonuses received from the purchaser, and RCW 82.04.240, which states the measure of the tax is the value of the products so manufactured *regardless of the place of sale or the fact that deliveries may be made to points outside the state."* (Italics ours.)

■ Once we reach the point where we need only to ascertain the meaning of *gross proceeds of sales,* our task becomes simpler because, by statute, it is declared to mean the value proceeding or accruing from the sale with no deduction allowed for the cost of the property to the seller, expressed in terms of money. RCW 82.04.070; RCW 82.04.090. The expression "gross proceeds" encompasses all tangibles and intangibles having a value in money received in consideration of a sale and is far more inclusive in meaning than such expressions as "sale price," "selling price," "list price," etc., which might have been used had the legislature intended a more restricted meaning. When the legislature took the broad expression "gross proceeds of sales" and enlarged it further by amplifying it with RCW 82.04.070 and RCW 82.04.090, it intended to include within

its meaning all considerations, expressed in dollars and cents, paid by an out-of-state purchaser to the manufacturer within this state for goods shipped to him—either directly or indirectly. Therefore, the underweights paid by the purchaser and received by the manufacturer are a part of the *gross proceeds of sales.*

The reasons given in *Crown Zellerbach Corp. v. State,* 53 Wn. (2d) 813, 328 P. (2d) 884, and *Crown Zellerbach Corp. v. State,* 45 Wn. (2d) 749, 278 P. (2d) 305, though not directly involving the problems presented here, do, we think, tend to support our conclusion in the instant case.

Appellant argues with great force that the construction placed on this statute by the State Tax Commission and upheld by the trial court renders the taxing statute unconstitutional as placing an impermissible burden on interstate commerce. It cites *Freeman v. Hewit,* 329 U.S. 249, 91 L. Ed. 265, 67 S. Ct. 274 (1946), in support, which, in turn, derives from *J. D. Adams Mfg. Co. v. Storen,* 304 U.S. 307, 82 L. Ed. 1365, 58 S. Ct. 913, 117 A.L.R. 429.

In *Freeman, supra,* a tax imposed by Indiana on the gross income derived from the sale of stock in New York was held invalid, and in *J. D. Adams Mfg. Co. v. Storen, supra,* Indiana tried to tax the gross income received from sales of machinery sold and delivered outside Indiana, and this tax was also held unconstitutional. But, in deciding these cases, the supreme court seemed to have in mind sustaining the very tax imposed in the instant case, for, in *Freeman v. Hewit, supra,* it said:

"... To extract a fair tithe from interstate commerce for the local protection afforded to it, a seller State need not impose the kind of tax which Indiana here levied. As a practical matter, it can make such commerce pay its way, as the phrase runs, apart from taxing the very sale. Thus, it can tax local manufacture even if the products are destined for other States. For some purposes, manufacture and the shipment of its products beyond a State may be looked upon as an integral transaction. ..."

And, in *J. D. Adams Mfg. Co. v. Storen, supra,* the supreme court took care to distinguish between a tax on in-

come derived from gross proceeds of sales and a tax on manufacturing when it said:

"So far as the sale price of the goods sold in *interstate commerce* includes compensation for a purely intrastate activity, the *manufacture* of the goods sold, it may be reached for local taxation by a tax on the privilege of manufacturing . . ." (Italics ours.)

█ The tax under attack here is neither a tax on gross income, net income, interstate sales, nor income derived from interstate sales. It is a tax on *manufacturing*, measured by gross proceeds from the sale of the manufactured articles, either within or without the state. The sale to an out-of-state customer does not create the taxable incident, but merely supplies the measure of the tax on the privilege of manufacturing the very article sold. It thus comes squarely within the holding declared in *American Mfg. Co. v. St. Louis,* 250 U.S. 459, 63 L. Ed. 1084, 39 S. Ct. 522, in which a tax levied upon manufacturing by the city of St. Louis was measured by the amount of sales of manufactured goods, sold within and outside the state of Missouri. Said that court in describing the tax:

". . . The tax is computed according to the amount of the sales of such manufactured goods, irrespective of whether they be sold within or without the State, in one kind of commerce or another . . ."

Said the court in upholding the tax:

"The city might have measured such tax by a percentage upon the value of all goods manufactured, whether they ever should come to be sold or not, and have required payment as soon as, or even before, the goods left the factory. . . . and also, perhaps, to bring merchants and manufacturers upon an equal footing in this regard, it has postponed ascertainment and payment of the tax until the manufacturer can bring the goods into market. . . .

". . .

". . . the operation and effect of the taxing ordinance are to impose a legitimate burden upon the business of carrying on the manufacture of goods in the city; it produces no direct burden on commerce in the goods manufactured . . . Therefore, *it does not amount to a regulation of interstate commerce.* And, for like reasons, it has

not the effect of imposing a tax upon the property or the business transactions of plaintiff in error outside of the State of Missouri, and hence does not deprive plaintiff in error of its property without due process of law." (Italics ours.)

Judgment is, therefore, affirmed.

DONWORTH, FINLEY, ROSELLINI, HUNTER, and HAMILTON, JJ., concur.

HILL, J. (dissenting)—I dissent. The majority makes an excellent explanation of the facts which present the problem in this case, and repetition is unnecessary.

The tax on St. Regis for the privilege of manufacturing plywood in this state is easily calculated, if we apply the express and, to me, unambiguous provisions of the applicable statute.

The measure of the tax is the value of the products manufactured "regardless of the place of sale or the fact that deliveries may be made to points outside the state." RCW 82.04.240.

RCW 82.04.450 provides that:

"The value of products . . . manufactured shall be determined by the gross proceeds derived from the sale thereof whether such sale is at wholesale or at retail, to which shall be added all subsidies and bonuses received from the purchaser or from any other person with respect to the extraction, manufacture, or sale of such products or by products by the seller, *except*:

"(1) . . .

"(2) *Where such products . . . are shipped, transported or transferred out of the state,* or to another person, *without prior sale* or are sold under circumstances such that the gross proceeds from the sale are not indicative of the true value of the subject matter of the sale.

"In the above cases *the value shall correspond as nearly as possible to the gross proceeds from sales in this state of similar products of like quality and character, and in similar quantities by other taxpayers,* plus the amount of subsidies or bonuses ordinarily payable by the purchaser or by any third person with respect to the extraction, manufacture, or sale of such products. The tax commission shall prescribe uniform and equitable rules for the purpose of ascertaining such values." (Italics mine.)

The Tax Commission's Published Rule 112, promulgated under the authority of this statute, essentially paraphrases the statute, except that it provides that:

". . . value shall correspond as nearly as possible to the gross proceeds from other sales at comparable locations in this state of similar products of like quality and character, and in similar quantities by the taxpayer or others, . . ."

The position of the Tax Commission in this case is that on the out-of-state sales the "value of the products" manufactured is the delivered price less the actual freight paid. The trial court agreed with the commission, as does the majority. (As made clear in the majority opinion, the purchasers of the out-of-state shipments were billed for an amount which equalled the f.o.b. mill price plus the estimated freight. The purchaser then paid the actual charge for freight and remitted the difference to St. Regis, the manufacturer.)

The method used by the Tax Commission to compute the value of the products does not conform to the plain wording of the statute, and the trial court's finding that there was no prior sale. The statute states that where products are transported out of the state without prior sale,

". . . value shall correspond as nearly as possible to the gross proceeds from sales in this state of similar products of like quality and character, and in similar quantities by other taxpayers . . ."

or, as modified by Published Rule 112, "by the taxpayer or others."

Accordingly, I would hold that "value of products" on which the manufacturing tax liability of plaintiff is to be based is its f.o.b. mill price within this state for other but similar products of like quality and character and in similar amounts.

In thus adhering to the express wording of the statute, I but follow the argument which the Tax Commission has used so successfully on so many occasions: that it is not ours to reason why; our only responsibility is to follow the wording of the taxing statute. *Bornstein Sea Foods,*

*Inc. v. State* (1962), 60 Wn. (2d) 169, 373 P. (2d) 483, is typical of the cases to which we refer.

This result would be consistent not only with the statute, but would produce the common-sense result that the value of the manufactured product, which is the measure of the tax for the privilege of manufacturing, is the same "regardless of the place of sale or the fact that deliveries may be made to points outside the state."

The State Tax Commission, with the laudable objective that no dollar received by any business in the state shall escape one or the other of our excise or privilege taxes, follows what seems to me a tortuous process of reasoning to add the amount of the "underweight revenue" to the f.o.b. price at the mill to arrive at the value of the manufactured product, and thus subject the "underweight revenue" to the tax for the privilege of manufacturing.

I have difficulty in following the circuitous route by which the majority gets away from the f.o.b. mill price, as the measure of the value of the manufactured product, to the "gross proceeds of sale" as the measure of value, particularly when carrying the burden of demonstrating "legislative intent." I can, however, understand the desire to reach that particular plateau, for then, as the majority says apparently with some considerable relief, "our task becomes simpler." The statutory definition of "gross proceeds of sale," quoted by the majority, is indeed inclusive.

To reach the "gross proceeds of sale" as the measure of the tax, the transaction must be removed from the specific exception contained in RCW 82.04.450, which says that the gross proceeds derived from the sale shall be the measure of the tax, except

" . . .

"Where such products . . . are shipped, transported or transferred out of the state, . . . without prior sale. . . ."

Therefore, it is argued, the manufactured product was sold before it left the state.

It seems to me that this argument is extremely tenuous in view of the unchallenged finding of the trial court that:

"Title to delivered out-of-state shipments did not pass to purchaser until delivery was completed."

There can be no question that prospective out-of-state purchasers had the right of inspection on delivery and could refuse to accept delivery. Reliance is placed by the majority on RCW 82.04.040 as making the definition of what constitutes a sale within the revenue act of the state different from the definition of a sale in other fields of law. It is true that RCW 82.04.040 extends the definition of a sale to include the renting or leasing of property and certain types of security transactions. With these we are not concerned, and under the definition of sale as "any transfer of the ownership of, title to, or possession of property for a valuable consideration," I fail to see where the ownership, the title, or the possession of the manufactured product had passed prior to the time that is was "shipped, transported or transferred out of the state."

The Tax Commission's position here would seem to be a reasoning from an unwarranted assumption to a foregone conclusion. Unless the "prior sale" can be established, we never reach the "gross proceeds of sale" measure of the value of the product manufactured.

But if we assume a "prior sale," I would point out that to adopt the "gross proceeds derived from the sale thereof" as the measure of the tax in this case, leads to a pitfall. It is apparent that the price f.o.b. the mill is attributable to the manufacturing process in the state of Washington, and that the "underweight revenues" are applicable only to out-of-state shipments and are obviously an increment of value directly attributable to the fact that the product is in interstate commerce.

A privilege tax on activities carried on within the state, measured by gross proceeds derived from interstate commerce, that are not apportioned to activities carried on within the state is precluded because such a tax burdens interstate commerce in the same manner and to the same extent as if the exaction were for the privilege of engaging in interstate commerce. *Gwin, White & Prince, Inc. v.*

*Henneford* (1939), 305 U.S. 434, 83 L. Ed. 272, 59 S. Ct. 325. We have held, in a case where we were upholding a tax as being on a purely local activity, that while the state may tax a local activity, such as the privilege of manufacturing, and may measure that tax by the sale price of the item sold in interstate commerce, it should be careful in so doing that the tax neither discriminates nor reaches that portion of gross compensation directly attributable to interstate commerce or activity therein. *Crown Zellerbach Corp. v. State* (1958), 53 Wn. (2d) 813, 816, 328 P. (2d) 884. In that case we said:

"A review of the Federal cases concerned with the power of a state to tax a purely local activity, measured by the gross receipts from sales of the product within and outside the taxing state, reveals that such taxes have been upheld, where the local taxable incident is one of sufficient substance so that the sales price substantially reflects the value of the products at the place of manufacture. . . ."

I submit that while the f.o.b. price at the mill reflects the value of the products at the place of manufacture, the addition of the underweight revenue to that price, if it reflects any added value, is attributable to the fact that the product is in interstate commerce.

Here we have a situation where to include the "underweight" revenue in the sale price, by which the tax is measured, results in discrimination (*i.e.*, a higher tax is paid for the privilege of manufacturing the identical product if shipped and sold outside of the state than if it is shipped and sold inside the state); and in which the portion of the tax which is directly attributable to the product being in interstate commerce, as distinguished from being attributable to a local activity, is apparent and calculable to the penny.

There can not be a clearer case of a readily calculable portion of a tax for the privilege of manufacturing in the state of Washington being attributable to its being shipped in interstate commerce.

It seems to me that there is no justification for rejecting an interpretation of the manufacturing-tax statute, that is

obvious and produces a common-sense result, and adopting in its stead a more tenuous interpretation which, while it nets a few more dollars for the state, raises serious constitutional issues. It should also be borne in mind that if there is any doubt as to the meaning of a taxing statute, it must be construed most strongly against the taxing power in favor of the taxpayer. *Buffelen Lbr. & Mfg. Co. v. State* (1948), 32 Wn. (2d) 40, 43, 200 P. (2d) 509; *Weyerhaeuser Tbr. Co. v. Henneford* (1936), 185 Wash. 46, 51, 53 P. (2d) 308.

I dissent.

OTT, C. J., and WEAVER, J., concur with HILL, J.

April 23, 1964. Petition for rehearing denied.