[No. 37308.   En Banc.   March 11, 1965.]

THE PULLMAN COMPANY, *Respondent*, v. THE STATE OF
WASHINGTON *et al.*, *Appellants.**

*The Attorney General, James A. Furber* and *Timothy R.
Malone, Assistants,* for appellants.

*Reported in 400 P. (2d) 91.

*Grosscup, Ambler, Miller & Lawrence* and *Ben C. Grosscup,* for respondent.

HALE, J.—When the railroads, according to a contractual formula, pay the Pullman Company sufficient funds to make good its operating losses, are such payments taxable under the public utility tax as a part of Pullman's gross operating revenue? And if, by virtue of a contract between the railroads and the Pullman Company, the latter performs maintenance and repair work on electrical and air-conditioning apparatus and is reimbursed by the railroads for the actual costs of such work, are these reimbursements taxable as revenue received for retailing services under the business and occupation tax? The Tax Commission says "yes," the Pullman Company answers "no," and the trial court, concurring with Pullman, granted a judgment for refund of taxes so paid under protest—a judgment from which the Tax Commission now appeals.

According to the terms of an agreement referred to by the railroads and the Pullman Company as the uniform service contract, the Pullman Company supplies the rail carriers on their own lines with the services, furnishings and personnel by which to provide the railroads' first-class-fare passengers with sleeper car accommodations. With few—and irrelevant—exceptions, Pullman owns none of the sleeper cars; they are on lease from the railroads to Pullman which staffs, mans and supplies the cars for occupancy by the railroads' passengers. A finding of fact describing the relationship is set forth in the margin.[1]

---

[1]"(a) During the period from January 1, 1956 through December 31, 1959, being the period covered by Tax Commission Assessment No. 109199 assessing additional taxes and audit interest against Pullman as more particularly hereinafter set forth, Pullman was engaged in the business of furnishing pullman accommodations and services to those passengers of railroads holding first class passenger tickets who desired such accommodations and services on the basis of rates and tariffs filed with the appropriate regulatory agencies, including the Interstate Commerce Commission and the Washington Public Service Commission, now Washington Utilities and Transportation Commission. Such pullman accommodations and services consist of providing to first class railroad passengers contracting therefor sleeping and daytime

The uniform service contract sets up a pooling arrangement for Pullman's sleeping cars and for its profits and losses as well. The agreement concerning sleeping cars requires Pullman to maintain a pool of sleeping cars and personnel essential to meet the needs of passenger traffic on the participating railroads. As to Pullman's profits and losses, after allowing Pullman a 3 per cent return on its depreciated investment, revenues in excess of costs of operation are allocated by Pullman to the participating railroads; losses experienced by Pullman are paid by the participating railroads to Pullman. These latter payments, from the railroads to Pullman, to make up for deficiencies in operating revenues, create the first problem. Are they tax-

occupancy 'spaces', together with washrooms and other furnishings and facilities, commonly called 'berths', 'roomettes', 'compartments' and 'drawing rooms', in cars operated by Pullman by furnishing and servicing the same at the request of the rail carriers pursuant to a contract with said rail carriers, known as the 'Uniform Service Contract of March 23, 1949,' as amended.

"(b) Pullman is not engaged in the transportation of passengers or property for hire or otherwise; it neither owns, leases nor operates any railroad trains, lines, tracks, engines or other means of locomotion. The cars in which Pullman provides its accommodations and services as aforesaid are attached to trains operated by rail carriers. Said trains are moved, operated and controlled solely by said rail carriers over their own lines with their own motive power and by their own personnel; and Pullman neither controls nor participates in any manner in such operation or movement. The movement of passenger trains and the transportation of passengers from their points of origin to points of destination is provided solely by the rail carriers pursuant to their own contracts of carriage with their passengers. Pullman contracts to furnish, and furnishes, its accommodations and services, in its cars attached to passenger trains as aforesaid, only to those patrons who by their purchase of first class passenger tickets have previously contracted with the rail carriers for their transportation from points of origin to points of destination; unless the patron has previously purchased a first class passenger ticket from the rail carrier for his rail transportation, he cannot purchase a ticket from Pullman for pullman accommodations and services. The purchase of and contract for passenger transportation from points of origin to points of destination and the purchase of and contract for pullman accommodations are individual and separate transactions; the former are consummated between the rail carrier and their passengers, and the latter are thereafter consummated between Pullman and those persons holding first class rail tickets who desire pullman accommodations and services." Finding of Fact No. 3.

able as gross operating revenues to Pullman under the public utility tax statutes? RCW 82.16.010, *et seq.*

At issue now is the taxable period from January 1, 1956, through December 31, 1959, covering the deficiency payments allocated by the railroads to Pullman arising *only* out of revenues from intrastate fares. We are not concerned here with an effort by the state to apportion between the intrastate part of a fare and the interstate portion, for the state in this appeal makes no claim to tax the deficiency payments made on fares sold to passengers traveling interstate. We are concerned only with deficiency payments made on fares sold to passengers traveling intrastate. The Tax Commission claims a tax of $10,847.29, and asked judgment to retain the tax paid under protest. Pullman asks for judgment in this amount to recover the tax so paid plus interest thereon.

Appellant Tax Commission asserts the tax under RCW 82.16.020, which reads, in part:

"There is levied and there shall be collected from every person a tax for the act or privilege of engaging within this state in any one or more of the businesses herein mentioned. The tax shall be equal to the gross income ['gross operating revenue' until amended April 1, 1959] of the business, multiplied by the rate set out after the business, as follows:

"(1) . . . railroad car . . . businesses: Three percent: . . ."

Does Pullman engage in the railroad car business? RCW 82.16.010(3) appears to make it so.

" 'Railroad car business' means *the business of operating* . . . *sleeping cars,* parlor cars . . . or any other kinds of cars used for transportation of property or persons upon the line of any railroad operated in this state when such railroad is not owned or leased by the person engaging in such business." (Italics ours.)

And, what is meant by *gross operating revenue,* or *gross income,* as it is called after April 1, 1959?

RCW 82.16.010(12) supplies the definition:

" 'Gross income' ['Gross operating revenue' until amended April 1, 1959] means the value proceeding or accruing *from the performance of the particular public service or trans-*

*portation business involved, including operations incidental thereto,* but without any deduction on account of the cost of the commodity furnished or sold, the cost of materials used, labor costs, interest, discount, delivery costs, taxes, or any other expense whatsoever paid or accrued and without any deduction on account of losses; . . ." (Italics ours.)

Respondent Pullman Company relies upon the trial court's finding that:

"Pullman is not engaged in the transportation of passengers or property for hire or otherwise; it neither owns, leases nor operates any railroad trains, lines, tracks, engines or other means of locomotion. The cars in which Pullman provides its accommodations and services as aforesaid are attached to trains operated by rail carriers. Said trains are moved, operated and controlled solely by said rail carriers over their own lines with their own motive power and by their own personnel; and Pullman neither controls nor participates in any manner in such operation or movement. . . . Pullman contracts to furnish, and furnishes, its accommodations and services, in its cars attached to passenger trains as aforesaid, only to those patrons who by their purchase of first class passenger tickets have previously contracted with the rail carriers for their transportation from points of origin to points of destination; . . ." Finding of fact No. 3.

■■■■ We recognize, of course, that findings supported by substantial evidence represent the facts of the case (*Calbom v. Knudtzon, ante,* p 157, 396 P. (2d) 148; *Willis v. Building Ser. Employees International Union, post,* p. 947, 396 P. (2d) 884; *Hennessey Funeral Home, Inc. v. Dean,* 64 Wn. (2d) 985, 395 P. (2d) 493), but must observe that the assertion, "Pullman is not engaged in the transportation of passengers or property for hire" proclaims a mere conclusion unsupported by either the evidence, the agreement or the other findings of fact. That the participating railroads supply the engines, track, fuel and energy by which Pullman's leased sleeping cars are hauled along the right of way, does not take Pullman out of the transportation business; nor does the purchase of a first-class railroad ticket, as both a separate transaction and condition precedent to the purchase of a pullman ticket, make Pullman's activities any less the

transporting of passengers. We think it self-evident that, when the company carries sleeping passengers in its leased cars for a consideration, it comes squarely within the statute (RCW 82.16.010(3)) defining railroad car business as the business of operating sleeping cars, parlor cars or other cars upon the lines of any railroad in this state if the railroad is neither leased nor owned by the company operating the sleeping cars.

Respondent points to *King Cy. Water Dist. No. 68 v. Tax Comm.,* 58, Wn. (2d) 282, 362 P. (2d) 244, and *Inland Empire Rural Electrification, Inc. v. Department of Public Ser.,* 199 Wash. 527, 92 P. (2d) 258, to support its argument that Pullman's contractual relationship with the railroads is not a public service and that payments to cover its operating revenue deficiencies are not therefore taxable as a revenue derived from performing a public service for compensation. *Inland Empire, supra,* seems unrelated to the problems here, nor do we see how the *King Cy. Water Dist.* case, *supra,* affects the meaning of the term "gross operating revenue" in the statute on the question of the railroad loss reimbursement payments. In that case, the water district undertook to install pipes and apparatus on the property of several customers and charged them the cost of such installation. We held these reimbursements for costs of installation not taxable as a part of the water district's gross operating revenue, and would come to the same conclusion again if a similar proposition were put to us. We think we correctly classified such items as reimbursement for capital outlay and were in no sense to be deemed income or value derived from the performance of a public service as described in RCW 82.16.010(11).

We conclude then that payments made by the operating railroads to the Pullman Company to make good the losses suffered by Pullman during an accounting period constitute gross operating revenue, a value proceeding or accruing to Pullman from the railroad car business, and, therefore, subject to the tax levied by RCW 82.16.020.

The next issue presents the question of whether approxi-

mately $300,000 paid by the railroads to Pullman during the 4 year audit period, compensating Pullman for repair and maintenance work on electrical and air-conditioning apparatus of the leased sleeping cars, falls within the retailing activities of the business and occupation tax. Under RCW 82.04.140, the Tax Commission demanded and the Pullman Company paid in protest the sum of $1,384.77. The section says:

" 'Business' includes all activities engaged in with the object of gain, benefit, or advantage to the taxpayer or to another person or class, directly or indirectly."

Claiming the repairing of electrical apparatus in yards within the state to be a retailing activity under the business and occupation tax, even though the services are rendered at cost and with no profit, as that term is usually understood, to the Pullman Company, the Tax Commission points to RCW 82.04.050. It reads:

" . . .

"The term 'sale at retail' or 'retail sale' shall include the sale of or charge made for tangible personal property consumed and/or for labor and services rendered in respect to the following: (a) The installing, *repairing*, cleaning, altering, imprinting, or improving *of tangible personal property* of or for consumers, . . ." (Italics ours.)

█ We do not see here a problem in interstate commerce even though the Pullman cars travel throughout the nation. The revenues sought to be taxed in this instance derive from work performed or services rendered in yards within this state; the activity for which reimbursement is made is, therefore, local and falls generally within the business and occupation tax. Taxing the revenues from repair work places no burden on interstate commerce merely because the repaired cars will travel in interstate commerce. Where the services are performed wholly within this state and the tax laid thereon applies indiscriminately to all persons performing like services in the state, the tax does not create an impermissible burden on interstate commerce. *Washington-Oregon Shippers Cooperative Ass'n, Inc. v. Schumacher,* 59 Wn. (2d) 159, 367 P. (2d) 112. On the sub-

ject of interstate commerce, perhaps no activity more markedly comes within this concept than an interstate pipeline, yet a tax on the local activities of maintaining, repairing and staffing such a pipeline within a state is held taxable as a local activity. *Memphis Nat. Gas Co. v. Stone,* 335 U.S. 80, 92 L. Ed. 1832, 68 S. Ct. 1475. Similarly, *Central Greyhound Lines, Inc. v. Mealey,* 334 U.S. 653, 92 L. Ed. 1633, 68 S. Ct. 1260; *Interstate Oil Pipe Line Co. v. Stone,* 337 U.S. 662, 93 L. Ed. 1613, 69 S. Ct. 1264.

■ Neither profit nor loss affect the ultimate decision as to whether an activity comes under the business and occupation tax, for the tax is to be measured by the gross revenues derived from engaging in the taxable activity. That during some taxable periods the activity may yield a profit and in others suffer a loss is immaterial to the enactment as presently worded. The tax is on the privilege of doing the things described in the act, *i.e.,* in this instance, retailing by repairing and maintaining cars for railroads not owned by the entity doing the work. Even though the payments for such work are intended to represent a reimbursement for the actual costs of such work and to yield no profit to Pullman, the activities do constitute "installing, repairing, cleaning, . . . or improving of tangible personal property of or for consumers" (RCW 82.04.050), and the payments to compensate for doing the repair work become taxable as part of the gross income derived from retailing under the business and occupation tax. That the gross or total revenue constitutes the *sine qua non* of the business and occupation tax may be seen in the recent case of *St. Regis Paper Co. v. State,* 63 Wn. (2d) 564, 388 P. (2d) 520.

The judgment is reversed with directions to enter a judgment of dismissal.

ALL CONCUR.

May 13, 1965. Petition for rehearing denied.