IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| FIRST DATA MERCHANT SERVICES LLC, a Florida limited liability company, | ) ) ) | No. 40584-2-III |
| Respondent, | ) ) | |
| v. | ) ) | PUBLISHED OPINION |
| STATE OF WASHINGTON, DEPARTMENT OF REVENUE, | ) ) ) ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, C.J. — First Data Merchant Services LLC is a processor of payment-card transactions. The question on appeal is whether First Data is liable for business and occupation (B&O) taxes for interchange fees charged by issuing banks. Issuing banks are banks that issue credit cards to consumers. Issuing banks fund a consumer's purchase. When doing so, they deduct a fee—referred to as an interchange fee or discount—before sending the funds through the processor to the merchant.

By law, First Data is liable for B&O taxes on its gross revenue; that is, the value proceeding or accruing from its services without deduction for any expense whatsoever. RCW 82.04.080. "Value proceeding or accruing" means the consideration actually

received or accrued.  RCW 82.04.090.

It is uncontested that issuing banks deducted the interchange fees before they sent payments through First Data to its merchants.  Therefore, the interchange fees were not consideration "actually received" by First Data.  The question then becomes whether the interchange fees were consideration that "actually accrued" to First Data.  For the reasons explained in our analysis, we conclude that those fees did not "actually accrue" to First Data and should not have been included in First Data's gross income for B&O tax purposes.  We affirm the trial court.

## FACTS

*Procedure*

In June 2018, the Washington State Department of Revenue (DOR) issued an excise tax advisory stating:

> "The Merchant Discount[1] is consideration that accrues to the Processor, thus representing gross income, notwithstanding that fees charged by other parties may be netted out before the Processor receives payment. Consequently, the Merchant Discount amount is gross income to the Processor subject to tax under the service and other business activities B&O classification."

Clerks Papers (CP) at 6.

---

[1] The Merchant Discount is comprised of the interchange fee, the card network fees, and the fees charged by the processor for authorization, clearing, and settlement services.

No. 40584-2-III
*First Data Merchant Servs. v. Dep't of Revenue*

To challenge the tax advisory, First Data reported and paid its October 2018 B&O taxes consistent with the advisory. It then brought suit seeking a refund of $180,076.87, representing the portion of its B&O tax payment attributable to the disputed interchange fees. First Data asserted that under RCW 82.04.090, the interchange fees were not taxable gross income because those fees were not consideration actually received or accrued by it.

In September 2023, the trial court granted partial summary judgment in favor of First Data, ruling that the interchange fees were not "actually receive[d]" by First Data. CP at 3691. The parties then proceeded to a three-day bench trial on whether the interchange fees "actually accrued" to First Data.

*The trial court's findings of fact[2]*

*Payment-card participants and fees*

Participants in a typical payment-card transaction are the cardholder, the merchant, the network, the issuing bank, the acquiring bank, and the processor for the acquiring bank. A network is an electronic system, such as Visa or Mastercard. The issuing bank is the cardholder's bank. The acquiring bank is the bank that submits payment-card

---

[2] Because DOR did not assign error to any of the trial court's findings, they are verities on appeal. *In re Marriage of Watanabe*, 199 Wn.2d 342, 349, 506 P.3d 630 (2022).

transactions to the networks on behalf of the merchants.

The acquiring bank is responsible for collecting electronic data about transactions from its merchants and submitting that data to the networks. These responsibilities are referred to as "acquiring services." A processor enters into a sponsorship agreement with an acquiring bank to allow the processor to provide acquiring services on the bank's behalf. Processors then enter into contracts with merchants that enable merchants to access the funding services in accordance with network rules. First Data is a processor.

Networks charge various fees, referred to as network fees. These fees are what networks receive for facilitating various aspects of the payment-card transactions. Network rules are created by the networks and govern many aspects of the transactions, including how participants in the payment-card process are compensated for their respective roles in authorizing, clearing, funding, and settling payment-card transactions. All parties to a payment-card transaction are subject to the network rules.

An interchange fee is the amount the network rules allow an issuing bank to charge for funding an approved payment-card transaction. Once a payment-card transaction is approved and the issuing bank receives the relevant information, the issuing bank funds the transaction, less the interchange fee.

At trial, DOR established that First Data's merchant contracts authorized First Data to charge its merchants all fees set forth in those contracts, which included interchange fees.

*Processing of payment-card transactions*

Processing payment-card transactions consists of three components—authorization, clearing, and settlement. Authorization involves the transfer of the cardholder and transaction data from the merchant to the processor, from the processor to the network, and from the network to the issuing bank. The issuing bank determines whether the payment card is valid and whether there is sufficient credit in the cardholder's account and then transmits either an approval or a decline code back through the same channels. No funds are transmitted during the authorization process.

Clearing involves transmitting data through the payment-card system. The merchant submits payment-card transaction data from all approved transactions that day in bulk to the processor, called a batch. The processor consolidates information from all the batches received from merchants for whom it processes, calculates the applicable interchange fee for each transaction in accordance with network rules/schedules, and then transmits that information to the networks for settlement. The networks then sort and transmit to each issuing bank the relevant cardholder transaction information from all

processors, along with the network's interchange fee calculation for each cardholder transaction.

Settlement involves the movement of funds. For each payment-card transaction, the network withdraws funds from the issuing bank's account and deposits those funds into the corresponding processor's account in an amount equal to the approved transaction amount, less the interchange fee retained by the issuing bank. The interchange fee is not distributed to the processor during settlement. The processor then deducts and transmits the appropriate fees and transfers the remaining amount to the merchant. The issuing bank then bills the cardholder for the full purchase amount, and the cardholder pays the issuing bank. The following diagram, from A through F, illustrates the settlement process for a $100 transaction:



CP at 105.

Based on its findings of fact, the trial court concluded that the interchange fees were not consideration that accrued to First Data. In reaching its conclusion, the trial court focused on two principles. First, citing *First American Title Insurance Co. v. Department of Revenue*, 144 Wn.2d 300, 27 P.3d 604 (2001), the trial court focused on how payment-card transactions actually worked, rather than as DOR urged, a processor's contractual right to charge merchants the interchange fee. And because First Data did not in fact charge its merchants the interchange fees, those fees were not consideration that actually accrued to First Data. Second, citing one of DOR's own published determinations that prohibits it from taxing accounting entries in a manner not recognized under normal rules of accrual accounting, the court concluded that the interchange fees were not consideration that actually accrued to First Data. The trial court ordered DOR to refund First Data that portion of its October 2018 B&O tax payment attributable to the interchange fees, plus interest.

DOR appealed to this court.

ANALYSIS

We begin with a general overview of B&O tax principles. "The business and occupation tax is not a tax on either profit or net gain or capital gain or sales, but a tax on the total money or money's worth received in the course of doing business." *Budget Rent-A-Car of Wash.-Or., Inc. v. Dep't of Revenue*, 81 Wn.2d 171, 173, 500 P.2d 764

7

(1972). "Neither profit nor loss affect the ultimate decision as to whether an activity comes under the business and occupation tax, for the tax is to be measured by the gross revenues derived from engaging in the taxable activity." *Pullman Co. v. State*, 65 Wn.2d 860, 867, 400 P.2d 91 (1965). The legislature intended the B&O tax to cover "'virtually all business activities carried on within the state.'" *Avnet, Inc. v. Dep't of Revenue*, 187 Wn.2d 44, 50, 384 P.3d 571 (2016) (plurality opinion) (quoting *Time Oil Co. v. State*, 79 Wn.2d 143, 146, 483 P.2d 628 (1971)).

The B&O tax defines "gross income of the business" as "the value proceeding or accruing . . . without any deduction . . . whatsoever." RCW 82.04.080(1). "Value proceeding or accruing" means "the consideration . . . actually received or accrued. The term shall be applied, in each case, on a cash receipts or accrual basis according to which method of accounting is regularly employed in keeping the books of the taxpayer." RCW 82.04.090. Because the parties agree that First Data never "actually received" the interchange fees, this case turns on the meaning of "actually accrued."

*Actually accrued*

We interpret statutes to implement the legislature's intent. *Avnet*, 187 Wn.2d at 49. "When possible, the court derives legislative intent solely from the plain language enacted by the legislature, considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, amendments to the

8

provision, and the statutory scheme as a whole." *Cashmere Valley Bank v. Dep't of Revenue*, 181 Wn.2d 622, 631, 334 P.3d 1100 (2014). "We generally defer to the statutory interpretation of the agency charged with implementing a statutory scheme. However, any doubts as to the meaning of a tax statute is construed against the taxing power. Substance rather than form should be used to assess tax classifications." *First Am.*, 144 Wn.2d at 303 (citations omitted).

As quoted above, RCW 82.04.090 directs us to apply the accounting method—cash receipts or accrual basis—regularly employed by the taxpayer. For this reason, we include further uncontested facts found by the trial court.

First Data is an indirect subsidiary of Fiserv, Inc., a publicly traded company. First Data, as an indirect subsidiary of Fiserv, is part of Fiserv's affiliated groups for financial statement and federal income tax reporting purposes. Fiserv and its subsidiaries prepare audited financial statements in accordance with "Generally Accepted Accounting Principles" (GAAP). GAAP standards are reflected in "Accounting Standards Updates" and are codified in "Accounting Standards Codification Topics" (ASCs). When GAAP is used in certain settings such as "United States Securities and Exchange Commission" (SEC) reporting and federal income tax returns, GAAP provides the concepts, objectives, standards, and conventions that define accrual accounting.

Since at least 2006, First Data and its parent companies have not reported interchange fees as revenue on their 10-K audited financial statements for SEC reporting requirements. Using GAAP accounting and applying ASC 606, interchange fees are not considered part of First Data's revenue or gross income.[3]

DOR promulgates administrative rules to assist in determining the meaning of various tax concepts, including when value accrues to a taxpayer. WAC 458-20-197(2)(a) provides, "When excise tax returns are made upon the accrual basis, value accrues to a taxpayer at the time: (i) The taxpayer becomes legally entitled to receive the consideration, or, (ii) In accord with the system of accounting regularly employed, enters as a charge against the purchaser, customer, or client the amount of consideration agreed upon, whether payable immediately or at a definitely determined future time." Subsection (2)(a)(i) supports DOR's argument that consideration accrues to First Data if it is legally entitled to receive interchange fees from its merchants. But because RCW 82.04.090 adds the concept of "actually" to "accrued," our focus turns to whether First Data is *actually* entitled to receive interchange fees from its merchants.

As borne out by the earlier depiction of how a $100 transaction actually is settled, a merchant does not receive $100 from the issuing bank for a $100 sale. Rather, the

---

[3] We recognize that this "finding" is a legal conclusion and undertake an independent review of this conclusion.

merchant actually receives $97. This is because the issuing bank already deducted the $2

interchange fee and the processor already deducted the $1 fee for distribution to the

network, the acquiring bank, and itself. If First Data, after forwarding only $97 to its

merchant, attempted to charge it the $2 interchange fee, First Data would be

unsuccessful. This is because the merchant effectively paid the $2 interchange fee (and

the $1 combination fee) when it received only $97 from First Data.

This is the same result required by *First American*. There, First American

provided title insurance through its branch offices and also through separate underwritten

title companies (UTCs). 144 Wn.2d at 301-02. The UTCs performed title searches, a

policy known as "abstracting," that culminated in a preliminary title report. *Id.* at 302.

Customers purchased the preliminary title reports and the title insurance from the UTCs.

*Id.* The UTCs retained the portion customers paid associated with abstracting services

and remitted the balance to First American. *Id.* DOR collected B&O taxes from the

UTCs for abstracting services and sought to collect B&O taxes from First American for

both its insurance services and the UTCs abstracting services. *Id.* The *First American*

court recognized that the title insurer and its UTCs were separate legal entities that

provided separate and distinct services. *Id.* at 303-05. It refused to treat the relationship

as one of principal and agent. *Id.*

11

Similar to *First American*, First Data did not "receive" the consideration for which DOR sought to impose B&O taxes. Also, similar to First American, First Data and the issuing banks are separate legal entities performing separate and distinct services. Issuing banks verify that their cardholders have sufficient credit for the purchase transactions, and, if so, the banks fund the transactions. Credit checking and funding are not services provided by First Data. *First American* prohibits DOR from assessing B&O taxes on First Data for consideration it did not receive and for separate services provided by a separate and distinct legal entity.

DOR argues that the relationship between the issuing banks and First Data is comparable to the relationship between a pepperoni maker and a pepperoni pizza maker, in which DOR assesses B&O taxes against the pizza maker for the value of the entire pizza, including the pepperonis. DOR's example does not apply here. DOR is able to tax the pepperoni pizza maker for all of the pizza toppings because the pizza maker receives from the customer the full price for the pizza, including toppings. Here, First Data did not receive the full price for the $100 transaction. It received only $98.

We conclude that the interchange fees did not actually accrue to First Data and those fees should not have been included in its October 2018 B&O gross revenue calculation.

We affirm the trial court.

_____
Lawrence-Berrey, C.J.

WE CONCUR:

_____
Staab, J.

_____
Murphy, J.