[No. 40162.     En Banc.     April 30, 1970.]

WASHINGTON TELEPHONE COMPANY, *Respondent*, v. THE
STATE OF WASHINGTON, *Appellant*.*

*The Attorney General, Henry W. Wager* and *Timothy R. Malone, Assistants,* for appellant.

*F. W. Durnan* (of *LeCocq, Simonarson & Durnan*), for respondent.

WEAVER, J.—This is an action to recover from the State of Washington $14,864.21, plus interest, the amount of public utility tax levied and paid pursuant to RCW

*Reported in 468 P.2d 687.

82.16.020.[1] The trial court entered judgment for plaintiff; the state appeals.

The sole question presented is whether the State of Washington may tax constitutionally plaintiff's gross receipts earned by transmitting interstate communications for the United States Air Force. The amount of the tax involved is the result of a state audit covering a $4\frac{1}{4}$-year period.

Plaintiff, a Washington corporation operating primarily in Whatcom County, is a public utility engaged in furnishing telephone service to the public.

Plaintiff has several contracts to furnish to the United States Air Force at its station at Blaine, Washington certain communication facilities composed primarily of circuitry and switching gear. Plaintiff's facilities are incorporated into the air force communication system as special equipment not furnished to commercial subscribers. This equipment is integrated with the air force equipment for use in the Semi-automatic Ground Environment system (SAGE) and the Ground Air Transmission system (GATR).

The Blaine air force station transmits information to and receives messages from aircraft deployed in the air defense program. Communications take three forms: radar, voice contact, and computer data. Transmissions rarely originate or terminate at the Blaine station; the messages are usually relayed to and from other air force bases throughout the country.

Plaintiff's equipment is quite sophisticated and primarily automatic; it converts the frequency of the air force messages to telephone frequency and sends the messages to their destination upon telephone circuits of other companies. Plaintiff's employees maintain, control, and repair the

---

[1] RCW 82.16.020. "There is levied and there shall be collected from every person a tax for the act or privilege of engaging within this state in any one or more of the businesses herein mentioned. The tax shall be equal to the gross income of the business, multiplied by the rate set out after the business, as follows:

"(1) Railroad, express, railroad car, water distribution, light and power, *telephone and telegraph businesses*: Three and six-tenths percent; . . ." (Italics ours.)

equipment. The tariff rates for the air force messages are filed with and approved by the Federal Communications Commission, not by the Washington Utilities and Transportation Commission.

Plaintiff claims that the gross receipts from the Blaine station operation were earned in the conduct of interstate communication and that this amount is not taxable under RCW 82.16.020 (see note 1), but is deductible from its total gross receipts pursuant to RCW 82.16.050:

In computing tax there may be deducted from the gross income the following items:

. . .

(6) Amounts derived from business which the state is prohibited from taxing under the Constitution of this state or the Constitution or laws of the United States;

. . .

A short thumbnail sketch of the historical background of the problem before us may be of interest and help.

One of the glaring defects in the Articles of Confederation (1781-1789), the first attempt of the American States to form a central government, was the lack of power to regulate commerce among the several states. To amend the articles and correct this deficiency was one of the prime purposes of the Annapolis Convention of 1786.

The Annapolis Convention accomplished little; it was attended by delegates of only five states. It did, however, lay the foundation for the [Constitutional Convention of 1787. Since the solution of problems of commerce among the states was of prime importance to the economic well-being of the new nation, it is not surprising that the influence of those who believed in a strong central government resulted in the promulgation and eventual adoption of article 1, section 8 of the new constitution:

The congress shall have power . . .

. . .

To regulate commerce with foreign nations, and among the several States, and with the Indian tribes;

It was probably anticipated by those espousing the doctrine of a strong central government, with control over

commerce between the states, that Chief Justice Marshall, in *Brown v. Maryland,* 25 U.S. (12 Wheat.) 419 (1827), would imply that the commerce clause of the federal constitution prohibited *all* state taxation of interstate commerce. As one legal commentator noted, this decision gave to interstate commerce a "judicial passport to the privileged sanctuary of tax immunity."

■ We must remember, however, that the volume and importance of commerce between the states then was but a fraction of its volume and importance to the economic welfare of the country now. The pole star, by which we should be guided, is the realization that in the exclusive field of interstate commerce the federal constitution and the laws of Congress are supreme; but interstate commerce should not be entitled to a "tax sanctuary" from which it can operate at a tax advantage over intrastate business.

■ The state's first contention is that the air force, not the plaintiff, engages in interstate communication; the plaintiff merely rents its equipment. We do not agree. Even though plaintiff does not have communication facilities crossing state lines, the fact that the destination of the messages it handles is beyond state lines by connection with carriers in other states makes plaintiff's activity one of interstate communication. *Ward v. Northern Ohio Tel. Co.,* 300 F.2d 816 (6th Cir. 1962). *New Jersey Bell Tel. Co. v. State Bd. of Taxes & Assessments,* 280 U.S. 338, 74 L. Ed. 463, 50 S. Ct. 111 (1930); *Fisher's Blend Station, Inc. v. Tax Comm'n,* 297 U.S. 650, 80 L. Ed. 956, 56 S. Ct. 608 (1936).

Our determination that the plaintiff's activities constitute interstate commerce does not, to our minds, free plaintiff from the tax in question.

The philosophy of taxation of interstate commerce, as announced over the years by the United States Supreme Court, has changed as the personnel of the court and its philosophy have changed.

This is illustrated in *Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 3 L. Ed. 2d 421, 79 S. Ct. 357 (1959), wherein the court stated:

This Court alone has handed down some three hundred full-dress opinions spread through slightly more than that number of our reports. As was said in *Miller Bros. Co. v. Maryland,* 347 U.S. 340, 344 (1954), the decisions have been "not always clear . . . consistent or reconcilable. A few have been specifically overruled, while others no longer fully represent the present state of the law." From the quagmire there emerge, however, some firm peaks of decision which remain unquestioned.

From the early doctrine of a "privileged sanctuary of tax immunity," many of the later decisions developed and applied the "direct-indirect" burden test. If the state tax was a direct burden on interstate commerce, it was unconstitutional; if it was an "indirect" tax, it was permitted to stand. *New Jersey Bell Tel. Co. v. Board of Taxes & Assessments, supra,* and *Fisher's Blend Station, supra,* are examples of the application of this test.

Mr. Justice Stone's dissent in *Di Santo v. Pennsylvania,* 273 U.S. 34, 71 L. Ed. 524, 47 S. Ct. 267 (1927), was the harbinger of the death knell of the "direct-indirect" burden test.

We are not here concerned with a question of taxation to which other considerations may apply, but with state regulation of what may be conceded to be an instrumentality of foreign commerce. As this Court has many times decided, the purpose of the commerce clause was not to preclude all state regulation of commerce crossing state lines, *but to prevent discrimination and the erection of barriers or obstacles* to the free flow of commerce, interstate or foreign.

The recognition of the power of the states to regulate commerce within certain limits is a recognition that there are matters of local concern which may properly be subject to state regulation and which, because of their local character, as well as their number and diversity, can never be adequately dealt with by Congress. Such regulation, so long as it does not impede the free flow of commerce, may properly be and for the most part has been left to the states by the decisions of this Court.

In this case the traditional test of the limit of state action by inquiring whether the interference with commerce is direct or indirect seems to me *too mechanical,*

*too uncertain in its application, and too remote from actualities, to be of value. In thus making use of the expressions, "direct" and "indirect interference" with commerce, we are doing little more than using labels to describe a result rather than any trustworthy formula by which it is reached.* [Italics ours.]

The "direct-indirect" test was the formalistic product of courts suspicious of state taxation; it bore no relation to the realities of interstate commerce. *Washington-Oregon Shippers Cooperative Ass'n v. Schumacher,* 59 Wn.2d 159, 166, 367 P.2d 112 (1961).

The United States Supreme Court apparently abandoned the test in *Western Live Stock v. Bureau of Revenue,* 303 U.S. 250, 82 L. Ed. 823, 58 S. Ct. 546, 115 A.L.R. 944 (1938), and in *General Motors Corp. v. Washington,* 377 U.S. 436, 12 L. Ed. 2d 430, 84 S. Ct. 1564 (1964).

Speaking for the court, in *Western Live Stock, supra,* Mr. Justice Stone, who also wrote the dissent in *Di Santo, supra,* said:

It was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business. "Even interstate business must pay its way," [authorities omitted] and the bare fact that one is carrying on interstate commerce does not relieve him from many forms of state taxation which add to the cost of his business.

The premise announced in *Western Live Stock, supra,* spawned a new method of testing the constitutionality and validity of a state tax upon an instrumentality of interstate commerce.

■ The rule is well-stated by this court in *Washington-Oregon Shippers Cooperative Ass'n v. Schumacher,* 59 Wn.2d 159, 167, 367 P.2d 112 (1961), *cert. den.* 370 U.S. 937 (1962).

Since the decision in *Western Live Stock v. Bureau of Internal Revenue* (1938), 303 U. S. 250, 82 L. Ed. 823, 58 S. Ct. 546, 115 A. L. R. 944, the primary considerations for determining the limits of a state's power to tax activities connected with interstate commerce have been these:

(1) Whether the tax places an extra burden on interstate commerce not borne by intrastate commerce, or erects barriers, placing out-of-state businesses at a disadvantage when competing locally; *the discrimination test.* (2) Whether the interstate commerce involved is subject to the risk of repeated exactions of the same nature from other states; *the multiple burden test.*

This court has, in subsequent decisions, discussed or applied either or both facets of the rule announced in *Washington-Oregon Shippers Cooperative Ass'n v. Schumacher, supra. See General Motors Corp. v. State,* 60 Wn.2d 862, 376 P.2d 843 (1962); *Pullman Co. v. State,* 65 Wn.2d 860, 866, 400 P.2d 91 (1965); *Continental Grain Co. v. State,* 66 Wn.2d 194, 401 P.2d 870 (1965).

■ We turn to the instant case. Plaintiff's activities are restricted to Washington; the tax cannot act as a barrier to its doing business in the state. It is treated in the same manner as other local businesses. It is clear that the state is ". . . exacting a constitutionally fair demand for that aspect of interstate commerce to which it bears a special relation." *General Motors Corp. v. Washington,* 377 U.S. 436, 440, 12 L. Ed. 2d 430, 84 S. Ct. 1564.

Plaintiff faces no risk of multiple taxation. Its facilities do not cross state lines; due process prevents other states from repeating a tax upon gross receipts earned in Washington. *Northwestern States Portland Cement Co. v. Minnesota, supra; see General Motors v. State, supra.* Although gross receipts must be apportioned according to their connection with local events to avoid cumulative taxation, *Michigan-Wisconsin Pipe Line Co. v. Calvert,* 347 U.S. 157, 98 L. Ed. 583, 74 S. Ct. 396 (1954); *Standard Oil Co. v. State,* 57 Wn.2d 56, 64, 355 P.2d 349 (1960), this does not pose a problem here. There is no need of apportionment since the totality of plaintiff's revenue earning activities occurs within the state. *See Convoy Co. v. Taylor,* 53 Wn.2d 439, 334 P.2d 772 (1959); *General Motors Corp. v. Washington, supra.*

We conclude that the gross receipts tax, as levied upon plaintiff, does not place an unconstitutional burden upon

930

interstate commerce; accordingly, the judgment of the trial court is reversed and judgment is directed for the state.

It is so ordered.

HUNTER, C. J., FINLEY, ROSELLINI, HAMILTON, HALE, NEILL, and McGOVERN, JJ., concur.