[Civ. No. 39195. First Dist., Div. Four. Feb. 8, 1978.]

BLUE STAR LINE, INC., et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO,
Defendant and Respondent.

HOEGH-UGLAND AUTO LINERS et al.,
Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO,
Defendant and Respondent.

430

COUNSEL

Graham & James, F. Conger Fawcett and David C. Nolan for Plaintiffs and Appellants.

Thomas M. O'Connor and George Agnost, City Attorneys, and John J. Doherty, Deputy City Attorney, for Defendant and Respondent.

OPINION

RATTIGAN, J.—Respondent City and County of San Francisco levies a tax upon the payrolls of employers who conduct business within its territorial limits. In two actions brought against it by appellants and other plaintiffs, they asserted the claim that various provisions of the United States Constitution invalidated the levy, as to them, because their local business activity engaged them in maritime foreign commerce at the ocean port of San Francisco. The appeal is from a portion of a

declaratory judgment, entered in the actions as consolidated, which denies the constitutional claim as to appellants.

The consolidated cause was submitted upon the pleadings, a lengthy written statement of stipulated facts, and some selected depositions and documentary exhibits which were stipulated into evidence. These sources support the following recitals (in which the direct quotations are from the statement of stipulated facts):

### The Payroll Tax

The tax is levied pursuant to a "Payroll Expense Tax Ordinance" adopted by respondent in 1970. Pertinent provisions of the ordinance are quoted in the margin.[1] It is also described in decisions which have previously adjudicated its validity and effect in various respects. (See

---

[1]"Section 2.6. 'Payroll Expense.' The term 'Payroll Expense' [as used in the ordinance] shall mean the compensation paid, including *salaries, wages, commissions* and other compensation to an individual who, during any tax year, performs work or renders services . . . in the City and County of San Francisco . . . .

"Section 2.7. 'Person.' The term 'person' shall mean any . . . domestic or foreign corporation . . . .

". . . . . . . . . . . . . . . .

"Section 3. Imposition of Payroll Expense Tax. A tax for general revenue purposes is hereby imposed upon every person who, in connection with his business, engages, hires, employs or contracts with one or more individuals as . . . Employee, to perform work or render services . . . within the City and County . . . . [¶] The amount of such tax . . . shall be one (1%) percent of the payroll expense of such person; provided, that such tax shall be levied only upon that portion of payroll expense which is attributable to the City and County . . . as set forth in Section 4. . . . [¶] This ordinance shall not be construed as requiring any license whatsoever, nor shall payment of this tax be a condition precedent to engaging in any business within the City and County . . . . This tax is imposed for general revenue purposes and *in order to require commerce* and the business community *to carry a fair share of the costs of local government in return for the benefits, opportunities and protections afforded by the City and County* . . . .

"Section 4. *Apportionment* of Payroll Expense. Where payroll expense is incurred by reason of work performed or services rendered by an individual, as . . . Employee, *partly within and partly without* the City and County . . . , the portion of such payroll expense attributable to the City and County . . . (and subject to tax hereunder) shall be determined as follows:

"(a) If the amount of such payroll expense depends on the volume of business transacted by such individual, then the portion of such payroll expense attributable to the City and County . . . shall be the portion . . . which the volume of business transacted by such individual *in* the City and County bears to the volume of business transacted by him *within and without* the City and County.

"(b) In all other cases, the portion of such payroll expense attributable to the City and County . . . shall be the portion . . . which the total number of working hours employed *within* the City and County bears to the total number of working hours *within and without* the City and County." (Italics added.)

*A.B.C. Distributing Co.* v. *City and County of San Francisco* (1975) 15 Cal.3d 566 [125 Cal.Rptr. 465, 542 P.2d 625]; *Western States Bankcard Assn.* v. *City and County of San Francisco* (1977) 19 Cal.3d 208 [137 Cal.Rptr. 183, 561 P.2d 273].) For purposes of its imposition upon appellants, all of whom are corporations, they must be divided into the three distinct classes next described.

### The "Steamship Lines"

Ten of the appellants (the so-called "steamship lines") own oceangoing vessels and operate them in international commerce. "All are corporations organized, existing and operating under the laws of friendly sovereign nations other than the United States; all have home ports, principal offices, and principal places of business outside San Francisco . . . and outside the United States. All of . . . [their] . . . vessels . . . are registered under the laws of various maritime nations other than the United States."[2]

The steamship lines' vessels call at the port of San Francisco from time to time. For this reason, each line "has appointed a steamship agent" who represents it there. (These "steamship agents" are in an appellant class of their own, as described below.) Some of the steamship lines maintain funds in San Francisco bank accounts which are held in the names of the respective principal and agent in each instance. Each steamship line maintains a listing, under its own name, in the San Francisco telephone directory. In addition, each employs one or more so-called "owner's representatives" who work for it there.

The owner's representatives are full-time salaried employees who occupy office space in San Francisco, "generally within the offices of the particular line's steamship agent." Their duties involve attending to the "operational side" of their employers' visiting ships, such as arranging for fuel, provisions, and repairs. Much of their work is performed in San Francisco proper, but their "sphere of operation[s]" includes the entire Pacific Coast of the United States and Canada.

---

[2]These stipulated statements paraphrase allegations made in both complaints filed below. The complaints and statements do not identify the nation in which any one steamship line maintains its home port or principal place of business (to which we may refer as its "home nation"), nor the country under whose laws its ships are registered (i.e., its "flag nation").

## The "Steamship Agents"

These appellants include 22 corporations, each of which is "organized and existing under the laws of one of the United States" and maintains an office in San Francisco. Each performs certain services for one or more of the steamship lines and other shipowners in international maritime commerce. These services are performed under contract. Some of them involve details of the "operational side" of the various principals' ships which call at San Francisco, and parallel or overlap the functions of the steamship lines' owner's representatives in these respects. When a steamship agent performs these services, it acts as "husbanding agent" and is paid on an "agreed fee per vessel basis."

Other contract services provided by the steamship agents include the coordination of cargo shipment and handling, arranging for and overseeing the "stevedoring" of ships, and the solicitation and "booking" of cargo and passengers. They act as "general agents" (or "port agents") when they discharge these functions, for which they are paid commissions based upon percentages of cargo and passenger "revenues" generated and collected.

So far as appears, all or most of these services are performed by salaried employees of the steamship agents. They work in San Francisco and elsewhere, and much of the traffic they produce originates and moves at places outside the city and county. Their activity nevertheless involves the ownership and use of personal property within its limits, the maintenance of records, bank accounts and telephone directory listings there, and the operation of motor vehicles on San Francisco streets.

## The "Stevedore Firms"

This class includes four corporations which are organized and existing under the laws of California or other states of this nation. Each of them maintains one or more offices in San Francisco, some own and operate "terminal facilities" there, and all perform services for the steamship lines and other shipowners whose vessels call at San Francisco. These services principally include the actual loading and unloading of cargo to and from ships, and to and from railroad cars in some instances, at San Francisco docks. The physical labor involved in the loading and unloading function is performed by longshoremen who are hired by the

job and paid by the hour. They work under the supervision of "full-time" salaried employees of the stevedoring firms. In loading or unloading a particular ship, the longshoremen and supervisory personnel "are variously on the dock, on ship's deck, and in ship's hold."

Some of the stevedore firms also provide "terminal services," which involve "the receipt and checking of outbound cargo and the checking, sorting and releasing of inbound cargo." These activities are performed "within the port and terminal area of the Port of San Francisco," but not on the docks. In addition, the stevedore firms occasionally rent cargo-handling equipment in San Francisco and sell "used or obsolete equipment" there. The terminal, rental and sale activities are apparently conducted by salaried employees.

In the conduct of all the activities described, the stevedore firms also maintain bank accounts in San Francisco, own and use personal property there, operate motor vehicles on local streets, and maintain listings in the San Francisco telephone directory.

### The Constitutional Issues

Respondent asserts the right to levy its tax upon the payrolls of all members of the three appellant classes, measured by the wages and salaries paid to their various employees for work performed in San Francisco as described above. Appellants contended below (1) that the levy upon the steamship lines' payrolls was prohibited by "certain treaties"; and that it otherwise violated the provisions of the United States Constitution which appear in (2) the fifth and sixth clauses of section 9 of article I, (3) the import-export clause, and (4) the commerce clause as it pertains to foreign commerce.[3]

---

[3]All constitutional citations herein are to the United States Constitution. As pertinent, the clauses here mentioned provide (italics added):

Article I, section 9: "[Fifth clause] No Tax or Duty shall be laid on *Articles exported from any State.* [Sixth clause] No preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another; nor shall Vessels bound to, or from, one State, be obliged to enter, clear, or pay Duties in another."

Import-export clause: "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws . . . ." (Art. I, § 10, cl. 2.)

Commerce clause: "The Congress shall have power . . . [t]o regulate commerce *with foreign nations,* and among the several States . . . ." (Art. I, § 8, cl. 3.)

*The Decision, Judgment, and Appeal*

The trial court announced its decision in a detailed memorandum opinion upon which it entered a declaratory judgment.[4] Part II of the judgment declares in effect that the payroll tax is validly levied upon the steamship lines' payrolls reflecting the compensation paid to their owner's representatives, and upon all payrolls of the steamship agents and the stevedore firms, subject in each instance to the apportionment formula whereby the taxable "payroll expense" is limited to work performed in San Francisco. (See §§ 3 and 4 of the tax ordinance, quoted in fn. 1, *ante.*) On the appeal, which is from this part of the judgment only,[5] appellants renew the four-point challenge of the tax they asserted below. (See the text at fn. 3, *ante.*) Each point requires separate analysis.

### (1) *The "Treaties" Point*

The steamship lines contend in effect that the levy of the payroll tax upon them is invalid in light of international "treaties," to which this nation is said to be a party, on the subjects of reciprocal taxation or avoidance of taxation. Although the real substance of this contention has not been acknowledged in the briefs, it raises the additional constitutional point that the alleged effect of the "treaties" immunizes the foreign-based steamship lines from the payroll tax by operation of the supremacy clause.[6]

Pursuing the point on appeal, the steamship lines refer to tax "treaties" between this country and two other nations only. They identify both by naming the nations as Japan and France, but not by express

---

[4]No findings of fact and conclusions of law were filed; the judgment recites that they were waived by the parties. Their omission means that we may resort to the memorandum decision if any explanation of the judgment is deemed necessary. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 231, pp. 4221-4223.)

[5]In one of two severable parts, the judgment declares that the payroll tax may not be levied upon some of the plaintiffs (certain steamship lines and one steamship agent) who do no business in San Francisco. The other part excludes, as "payroll expense" measuring the tax payable by the steamship lines, the wages paid crew members who work on their itinerant ships in San Francisco waters. Respondent has not appealed from either of these parts of the judgment, and neither is involved in our review.

[6]"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all *Treaties* made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (Art. VI, cl. 2 [italics added].)

citation. They follow the references with a categorical statement that "[t]he United States has such treaty commitments . . . with the following countries, representing essentially all of the nations whose carrier-nationals are represented here: Australia, France, Germany, India, Israel, Italy, Japan, the Netherlands, Norway, Philippines, Sweden, and the United Kingdom."

The sum of this context refers us to an unknown number of possibly pertinent tax treaties (or "treaty commitments") which might exist between the United States and any one of the other 12 nations named. The record on appeal identifies no such treaties or "commitments," it actually fails to support the categorical assertion that the 12 named countries are "nations whose carrier-nationals are represented" among the steamship lines, and further inquiries by this court have not confirmed the assertion as to all of them.[7] We have nevertheless pursued the point by resorting to a compendium of current treaties of the United States, which shows not less than 25 possibly pertinent tax treaties (or "conventions," "protocols," "agreements," "notes," or "arrangements") with some—but not all—of the 12 nations named above.[8]

Although none of these sources has been cited, we have looked at all of them. It will suffice to state that we find nothing in them which

[7]As we have observed, neither the pleadings nor the stipulated facts establish the identity of the home or flag nation of any one of the steamship lines. (See fn. 2, *ante.*) The trial court referred to "certain treaties" in its memorandum decision (see fn. 4), but cited none and named no nations. The omission of pertinent national identities might have been noted and corrected in the formulation of findings of fact and conclusions of law, but these were waived. (See *ibid.*) A single set of answers to interrogatories, which were included in the record on appeal by selective choice, identified one country (Japan) as the home and flag nation of one—but only one—steamship line. The lone entry prompted us to go through the superior court's entire file (as made available to us by its clerk) for similar information concerning the other nine lines. We found such information as to four of them, but none at all concerning the others. The missing national identities are not facts of which judicial notice is required (see Evid. Code, §§ 451, 452), and discretionary judicial notice of them has not been requested. (See *id.,* §§ 453, 459.) The factual omissions have been further complicated because the steamship lines name 12 countries as "nations whose carrier-nationals are represented here," but there are only 10 steamship lines among the appellants. In sum, the record is utterly inadequate to support the pertinence of any tax "treaty" with any particular foreign nation.

[8]This source is Treaties in Force: A List of Treaties and Other International Agreements of the United States in Force on January 1, 1977" (U.S. Dept. of State, Pub. No. 8891). The possibly pertinent tax documents are identified in part I ("Bilateral Treaties And Other Agreements"), under the name of each party nation and the heading "Taxation." Part II lists "Multilateral Treaties And Other Agreements" by subjects, which do not include "taxation."

supports the steamship lines' "treaties" point; for lack of an adequate record (see fn. 7, *ante*) and explicit treaty citations, our inquiry may go no further. (See 6 Witkin, Cal. Procedure, *op. cit, supra*, Appeal, §§ 373 [p. 4345], 425 [p. 4391], 427 [pp. 4393-4394].) The point fails.

### (2) *The Fifth and Sixth Clauses of Section 9 of Article I*

The term "articles exported," as used in the fifth clause of this section (quoted in fn. 3, *ante*), has the same meaning as the term "exports" which appears in the import-export clause. (*Kosydar* v. *National Cash Register Co.* (1974) 417 U.S. 62, 67, fn. 5 [40 L.Ed.2d 660, 665, 94 S.Ct. 2108].) Any effect of the fifth clause may therefore be disregarded because our discussion of the import-export clause will reach it. Any effect of the sixth clause of section 9 may similarly be disregarded because it has no perceptible relevance to the foreign-commerce situation presented here (see its text as quoted in fn. 3, *ante*) and—more important—because appellants cite it only once and argue it not at all. (See 6 Witkin, Cal. Procedure, *op. cit. supra*, Appeal, § 425, p. 4391.)

### (3) *The Import-Export Clause*

In its earlier decisions dealing with the prohibitory language of the import-export clause ("No State shall . . . lay any imposts or duties on imports or exports" [see fn. 3, *ante*]), the United States Supreme Court treated it as an absolute bar to the levy of any local tax which even indirectly reached articles in the flow of importation to, or exportation from, this country. (*Spalding & Bros.* v. *Edwards* (1923) 262 U.S. 66, 68-70 [67 L.Ed. 865, 867-868, 43 S.Ct. 485]; *Richfield Oil Corp.* v. *State Board* (1946) 329 U.S. 69, 78-83 [91 L.Ed. 80, 90-93, 67 S.Ct. 156].) The court has since qualified the effect of this view, and distinguished *Spalding* and *Richfield,* by holding that the import-export clause does not bar a local tax which reaches only the dockside "handling" of articles in the flow of maritime importation or exportation, and is not levied upon the articles themselves: "The difference is that . . . the tax is not on the *goods* but on the *handling* of them at the port." (*Canton R. Co.* v. *Rogan* (1951) 340 U.S. 511, 513-515 [95 L.Ed. 488, 493, 71 S.Ct. 447, 451, 20 A.L.R.2d 145] [original italics]. Cf. *Western Maryland R. Co.* v. *Rogan* (1951) 340 U.S. 520-522 [95 L.Ed. 501-503, 71 S.Ct. 450, 451] [companion case]; *Shell Oil Co.* v. *State Bd. of Equal.* (1966) 64 Cal.2d 713, 721-722 [51 Cal.Rptr. 524, 414 P.2d 820], app. dism. (1967) 386 U.S. 211 [17 L.Ed.2d 870, 87 S.Ct.

973]; *South Coast Fisheries, Inc.* v. *Department of Fish & Game* (1963) 213 Cal.App.2d 325, 328-329 [28 Cal.Rptr. 537], app. dism. (1963) 375 U.S. 57 [11 L.Ed.2d 122, 84 S.Ct. 174]. See Annot., Imports and Exports—State Taxation (1977) 46 L.Ed.2d 955, 977-978.)

■ Respondent's payroll tax reaches only the dockside "handling" of imported and exported articles by employees of the stevedore firms, and it falls even further away from the articles insofar as it reaches the San Francisco activities of the steamship lines' owner's representatives and the employees of the steamship agents. Because it does not reach the articles themselves, the import-export clause does not invalidate its levy upon appellants' payrolls. (*Canton R. Co.* v. *Rogan, supra,* 340 U.S. 511 at pp. 513-515 [95 L.Ed. 488 at pp. 492-493].)

### (4) *The Commerce Clause*

Appellants' challenge of the payroll tax, based upon the commerce clause, rests upon the stated premise that its imposition casts upon their San Francisco business activities, in foreign commerce, a "direct burden" which the clause does not permit. The premise reflects a distinction drawn in older decisions of the United States Supreme Court which invalidated taxes if they "directly" burdened the process of importation or exportation in foreign commerce (*Fairbank* v. *United States* (1901) 181 U.S. 283, 293 [45 L.Ed. 862, 866-867, 21 S.Ct. 648]), or the flow of interstate commerce (*New Jersey Tel. Co.* v. *Tax Board* (1930) 280 U.S. 338, 348-349 [74 L.Ed. 463, 468-469, 50 S.Ct. 111]), but sustained them where their burden was imposed only "indirectly and remotely." (*Peck & Co.* v. *Lowe* (1918) 247 U.S. 165, 173-174 [62 L.Ed. 1049, 1051, 38 S.Ct. 432] [foreign commerce]; *United States Glue Co.* v. *Oak Creek* (1918) 247 U.S. 321, 328-329 [62 L.Ed. 1135, 1141, 38 S.Ct. 499] [interstate commerce]. See discussion, *Washington Telephone Company* v. *State* (1970) 77 Wn.2d 923 [468 P.2d 687, 689].)

This standard no longer applies in the *interstate* commerce area of the commerce clause. (See the continuing discussion in *Washington Telephone Company* v. *State, supra,* 468 P.2d 687 at p. 690.) ■ Under the modern test, a given tax will be upheld if it is "fairly apportioned" to local activity in accordance with the concepts that interstate commerce is to be protected against discrimination, and from exposure to the cumulative burdens of "multiple taxation" locally and elsewhere, but must otherwise "pay its way." (*Western Live Stock* v. *Bureau* (1938) 303

U.S. 250, 256-257, 258 [82 L.Ed. 823, 828-830, 58 S.Ct. 546, 115 A.L.R. 944]; *Wisconsin* v. *J. C. Penney Co.* (1940) 311 U.S. 435, 444 [85 L.Ed. 267, 270, 61 S.Ct. 246, 130 A.L.R. 1229]; *Memphis Gas Co.* v. *Stone* (1948) 335 U.S. 80, 85-88 [92 L.Ed. 1832, 1838-1840, 68 S.Ct. 1475]; *Northwestern Cement Co.* v. *Minn.* (1959) 358 U.S. 450, 458-462 [3 L.Ed.2d 421, 427-430, 79 S.Ct. 357, 67 A.L.R.2d 1292]; *General Motors* v. *Washington* (1964) 377 U.S. 436, 439-441 [12 L.Ed.2d 430, 433-435, 84 S.Ct. 1564].)

"These decisions [just cited] have considered not the formal language of the tax statute but rather its practical effect, and have sustained a tax against Commerce Clause challenge when the tax is applied to an activity with a substantial *nexus* with the taxing State, is *fairly apportioned,* does *not discriminate* against interstate commerce, and is *fairly related to the services provided* by the State." (*Complete Auto Transit, Inc.* v. *Brady* (1977) 430 U.S. 274, 279 [51 L.Ed.2d 326, 331, 97 S.Ct. 1076] [fn. omitted; italics added].) The "fairly related" element refers to the requirement that the affected business, although engaged in interstate commerce, must "pay its *just share of the cost* of [local] government upon which [it] necessarily relies and by which it is furnished *protection and benefits.*" (*Colonial Pipeline Co.* v. *Traigle* (1975) 421 U.S. 100, 114 [44 L.Ed.2d 1, 12, 95 S.Ct. 1538] [italics added].)

Application of the modern standard, in interstate commerce cases, requires examination of the particular local activity which the taxing authority has attempted to reach. Its tax will be invalidated, as an "impermissible burden on interstate commerce," if its "nominal subject . . . is 'such an integral part of the interstate process, the flow of commerce, that it cannot realistically be separated from it.' " (*Dunbar-Stanley Studios* v. *Alabama* (1969) 393 U.S. 537, 540 [21 L.Ed.2d 759, 763, 89 S.Ct. 757] [quoting *Mich.-Wis. Pipe Line Co.* v. *Calvert* (1954) 347 U.S. 157, 166 (98 L.Ed. 583, 591, 74 S.Ct. 396)].) Conversely, a local tax will not offend the commerce clause if the activity it reaches may be perceived to have an "essentially local character." (*Dunbar-Stanley Studios* v. *Alabama, supra,* at pp. 540-541 [21 L.Ed.2d at p. 763].)

Since these standards have been held to apply in the *interstate* commerce cases decided under the commerce clause, the question is whether they are to be applied in the *foreign* commerce situation presented here. No clear authority to this effect has been cited, but we

perceive its equivalent in a very recent decision dealing with the import-export clause. (*Michelin Tire Corp.* v. *Wages* (1976) 423 U.S. 276 [46 L.Ed.2d 495, 96 S.Ct. 535].) That case involved the validity of ad valorem property taxes levied upon automobile and truck tires which had been imported from other nations and warehoused, still in their original containers, in the taxing jurisdiction. (*Id.,* at pp. 279-281 [46 L.Ed.2d at pp. 499-501].) The United States Supreme Court sustained the taxes against a contention that they violated the import-export clause (pp. 278-279, 281-283 [46 L.Ed.2d pp. 499-502]), abandoned the long-standing "original container doctrine" in the process (pp. 279, 294-301 [46 L.Ed.2d pp. 499-500, 508-512] [overruling *Low* v. *Austin* (1871) 80 U.S. (13 Wall.) 29 (20 L.Ed. 517)]), and stated in pertinent part: "Unlike imposts and duties, which are essentially taxes on the commercial privilege of bringing goods into a country, such property taxes are taxes by which a State *apportions the cost* of such services as police and fire protection among the beneficiaries according to their respective wealth; there is no reason why an importer should not *bear his share of these costs* along with his competitors handling only domestic goods. . . . To be sure, allowance of *nondiscriminatory* ad valorem property taxation may increase the cost of goods purchased by 'inland' consumers. But as already noted, such taxation is the *quid pro quo* for benefits actually conferred by the taxing state. There is no reason why local taxpayers should subsidize the services used by the importer; ultimate consumers *should pay for such services as police and fire protection* accorded the goods just as much as they should pay transportation costs associated with those goods." (*Michelin Tire Corp.* v. *Wages, supra,* 423 U.S. 276 at pp. 287-289 [46 L.Ed.2d 495 at pp. 504-505] [italics added, fns. omitted].)

Although *Michelin Tire* is not a commerce clause decision, it unmistakably deals with local taxes affecting foreign commerce. We find in the quoted language the essence of the modern cases which will validate a local tax under the commerce clause, although it affects *interstate* commerce, if it reaches a taxable "nexus," is "fairly apportioned" to local activity, "does not discriminate" against the affected commerce, and is "fairly related to the services provided" by the taxing jurisdiction. (*Complete Auto Transit, Inc.* v. *Brady, supra,* 430 U.S. 274 at p. 279 [51 L.Ed.2d 326 at p. 331].) We conclude that the interstate commerce standards are to be applied in the foreign commerce situation here. The only remaining questions involve their application to each of the three appellant classes.

■ Because all three classes function through their employees in San Francisco, and pay them there, a taxable "nexus" appears in each instance. (Cf. *Wisconsin* v. *J. C. Penney Co., supra,* 311 U.S. 435 at p. 445 [85 L.Ed. 267 at p. 271]; *Northwestern Cement Co.* v. *Minn., supra,* 358 U.S. 450 at pp. 464-465 [3 L.Ed.2d 421 at pp. 430-431]; *General Motors* v. *Washington, supra,* 377 U.S. 436 at p. 448 [12 L.Ed.2d 430 at p. 439].) The payroll tax is fairly apportioned to local activity because its payroll base is measured by the hours of work actually performed within the city and county. (See § 4 of the tax ordinance, quoted in fn. 1, *ante.* See also *General Motors* v. *Washington, supra,* at pp. 447-448 [12 L.Ed.2d at pp. 438-439].) The tax does not discriminate against employers engaged in foreign commerce because it is levied upon all San Francisco employers alike. (See § 3 of the ordinance in fn. 1.) The tax is "fairly related to the services provided" by respondent because the ordinance so provides (see § 3, *ibid.*), and it is an obvious *"quid pro quo* for benefits actually conferred" by San Francisco in the form of "such services as police and fire protection." (*Michelin Tire Corp.* v. *Wages, supra,* 423 U.S. 276 at p. 289 [46 L.Ed.2d 495 at p. 505].)

The payroll tax thus meets all the applicable constitutional standards, with a single possible exception which pertains to the stevedore firms alone. The possibility is not presented by the "terminal services" and other activities which they perform away from San Francisco docks, but by the "loading and discharge" functions which they carry on at dockside. Because these functions involve their employees' passage "on the dock, on ship's deck, and in ship's hold" (as stipulated by the parties), and because the ships involved are instrumentalities in the actual flow of foreign commerce, it is suggested that the dockside activities may not be reached by the payroll tax because they are " 'such an integral part' " of the flow that they " 'cannot realistically be separated from it.' " (*Dunbar-Stanley Studios* v. *Alabama, supra,* 393 U.S. 537 at p. 540 [21 L.Ed.2d 759 at p. 763].)

The suggestion refers us to a progression of decisions dealing with identical dockside activities by stevedores. The United States Supreme Court initially held that their actual loading and unloading of ships was immune from local business taxes because the functions were an inseverable part of the flow of maritime interstate and foreign commerce. (*Puget Sound Co.* v. *Tax Commission* (1937) 302 U.S. 90, 92-94 [82 L.Ed. 68, 70-72, 58 S.Ct. 72]; *Joseph* v. *Carter & Weekes Co.* (1947) 330 U.S. 422, 424-426, 433 [91 L.Ed. 993, 998-1000, 1004, 61 S.Ct. 815].) In its later

*Canton Railroad* decision, the court revisited the subject; observed that the dockside activities involved in that case stopped short of the actual loading and unloading of ships; and, for that reason, expressly *left open* the question "whether loading for export and unloading for import are immune from [local] tax by reason of the Import-Export Clause." (*Canton R. Co.* v. *Rogan, supra,* 340 U.S. 511 at p. 515 [95 L.Ed. 488 at p. 493]; 5 Witkin Summary of Cal. Law (8th ed. 1974) Taxation, § 57, p. 4042.)

In a case decided only last year, the Supreme Court of Washington reviewed these decisions and invalidated a state "stevedoring tax," as a violation of the commerce clause and the import-export clause alike, upon the stated ground that "[t]he United States Supreme Court obviously views stevedoring as an integrated inseparable part of commerce by sea, and hence absolutely protected." (*Ass'n. of Wash. Stevedoring* v. *State, etc.* (1977) 88 Wn.2d 315 [559 P.2d 997, 998].) The United States Supreme Court granted certiorari on October 3, 1977 (434 U.S. 815 [54 L.Ed.2d 70, 98 S.Ct. 51]), and has the Washington case under review at this time. These last events may not yet be deemed decisive, but they support the conclusion that the question left open in *Canton Railroad* should presently be resolved in favor of respondent's payroll tax insofar as it reaches the stevedoring firms' activities in the actual loading and unloading of ships docked at San Francisco. We therefore hold that the tax is validly levied upon their payrolls without exception.

The judgment is affirmed.

Caldecott, P. J., and Christian, J., concurred.

A petition for a rehearing was denied March 3, 1978, and the opinion was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied April 6, 1978.