[No. B063347. Second Dist., Div. Three. May 27, 1993.]

CITY OF LOS ANGELES, Plaintiff and Respondent, v.
MARINE WHOLESALE/WAREHOUSE CO., INC., Defendant and
Appellant.

COUNSEL

Goldfarb, Sturman, Averbach & Sturman and Martin B. Snyder for Defendant and Appellant.

James K. Hahn, City Attorney, Richard A. Dawson, Assistant City Attorney, and Myrtle Dankers, Deputy City Attorney, for Plaintiff and Respondent.

OPINION

KITCHING, J.—Marine Wholesale/Warehouse Co., Inc. (Marine) appeals from a judgment granted in favor of the City of Los Angeles (City) in the amount of $10,034.06.

We affirm based upon our finding that the City's imposition of a gross receipts and payroll tax on Marine's business operations is not preempted under the supremacy clause. Additionally, the tax does not violate the import-export clause or the commerce clause.

### FACTUAL AND PROCEDURAL BACKGROUND

This case concerns the validity of business taxes assessed against Marine by City for the period 1984 through 1987 and was submitted on the following stipulated facts:

"1. [City] is a municipal corporation organized and existing under and by virtue of the Constitution and laws of the State of California.

"2. [Marine] is a corporation duly organized and existing under the laws of the State of California, authorized to transact business within the State of California.

"3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"4. Importers in the United States have available several methods by which they may defer or avoid paying customs duties on their goods. These methods are known as the 'temporary entry system,' established by Congress by its first Tariff Act and expanded and refined thereafter. Generally, the system enables importers either to pay no duty or to receive a refund on duty paid on imported goods that are subsequently exported or destroyed or to hold the goods under customs supervision and postpone paying duty until the goods are released for domestic use or sale. Customs bonded warehouses are one of the four components of the temporary entry system. They provide a means by which the owner or importer may store goods under customs supervision upon the payment of a bond, which insures the payment of duties only if the goods are released for domestic consumption. If the goods are exported or destroyed, no federal tax or duty is imposed.

"5. From before 1984 through 1990, Marine has maintained a customs bonded warehouse at 301 West 'B' Street, Wilmington, which is within the corporate borders of the City.

"6. Marine, during the period of 1984 through 1990, operated a customs bonded warehouse, into which it placed all the goods it received. Marine then sold supplies to ships and airlines out of the customs bonded warehouse, at retail and at wholesale. The warehouse was owned by Marine. Some of the goods sold by Marine came directly from a foreign country to the bonded warehouse, some came from within the United States.

"7. Marine engaged solely in sales of goods from its customs bonded warehouse to cruise ships and airlines that were engaged solely in sailing to foreign ports and flying to foreign locations (international flights). Only ships and airlines so engaged in travel to foreign locations bought merchandise from Marine. Marine has similar business operations in some other cities as well, including Oakland and Honolulu. None of the goods sold by Marine were destined for domestic manufacture or sale, and none were opened or consumed in domestic locations.

"8. Retail sales included goods such as tonic and other mixers for drinks, which were sold only for opening and consumption beyond the territorial limits of the United States.

"9. The goods stored and sold at wholesale were distilled liquors and imported beer and tobacco.

"10. Marine's corporate and accounting records were maintained in the City.

"11. Goods sold by Marine were delivered to the ship at dockside or airports for airlines at which time title passed, under the supervision of United States Customs Service, with export customs bonded paperwork. Bills for the goods were sent to the appropriate office of the buyer and payments were received in the City.

"12. Goods were delivered from Marine's bonded warehouse in the City or from a bonded warehouse in Carson or from a foreign trade-free zone in Long Beach or Oakland.

"13. The goods sold by Marine were not opened or consumed by the buyer until the ship or airplane was beyond the territorial limits of the United States.

"14. Marine also sold to airlines for opening and consumption in flight solely beyond the territorial limits of the United States.

"15. On September 5, 1986, the City completed an audit of Marine's books and on November 3, 1986, levied an assessment of $4,147.80 consisting of $3,358.87 in taxes, $788.93 in interest.

"16. At the request of Marine a hearing was held before a Board of Review, and the assessment was confirmed.

"17. On February 8, 1990, an additional assessment for the year 1987 was made in the amount of $2,525.01 consisting of $1,530.31 principal, $688.64 interest, and $306.06 penalty.[1]

"18. No amount has been paid on the 1986 or 1990 assessment.

"19. Marine has exhausted its administrative remedies and the question of the liability of Marine for the tax on sales of goods from its customs bonded warehouse to buyers who resell and/or consume the goods outside the territorial limits of the United States is properly before this court."

On April 23, 1991, the case was tried pursuant to the joint stipulation of facts. On August 13, 1991, the court issued its statement of decision, followed by a judgment after trial by court in favor of the City. Marine filed a timely notice of appeal.

CONTENTIONS

Marine contends:

1. The taxes at issue are preempted under the supremacy clause because of Congress's comprehensive regulation of customs-bonded warehouses.

2. The taxes violate the import-export clause.

3. The taxes violate the commerce clause.

DISCUSSION

1. *The Taxes Are Not Preempted*[2]

Marine argues that its gross receipts and payroll expenses are protected from municipal taxation because its goods are stored in a customs-bonded warehouse, a subject of comprehensive congressional regulation.

In order to determine if Congress has preempted a specific field, we must examine the congressional intent. (*Rice* v. *Santa Fe Elevator Corp.*

---

[1]The taxes at issue are gross receipts, warehousing and payroll expense taxes. (L.A. Mun. Code, §§ 21.11.1 [payroll expense tax], 21.141 [warehousing tax], 21.166 [gross receipts tax on wholesale sales], 21.167 [gross receipts tax on retail sales].)

[2]The supremacy clause states the "Constitution and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land." (U.S. Const., art. VI, cl. 2.)

(1947) 331 U.S. 218, 230 [91 L.Ed. 1447, 1459, 67 S.Ct. 1146].) We may find an intent to preempt where Congress has comprehensively legislated in a field so there is no room left for state legislation. (*Ibid.*) A field will also be preempted where any state legislation would interfere with the purposes and policies behind the congressional legislation. (*Hines* v. *Davidowitz* (1941) 312 U.S. 52, 67 [85 L.Ed. 581, 586-587, 61 S.Ct. 399].)

The Supreme Court has addressed the issue of whether state and local taxes are preempted as they relate to customs-bonded warehouses. It has considered the purposes and policies behind the customs-bonded warehouses and has found that an important purpose of the warehouse system is the stimulation and encouragement of foreign commerce.

"Pursuant to its powers under the Commerce Clause, Congress established a comprehensive customs system which includes provisions for Government-supervised bonded warehouses where imports may be stored duty free for prescribed periods. At any time during that period the goods may be withdrawn and reexported without payment of duty. Only if the goods are withdrawn for domestic sale or stored beyond the prescribed period does any duty become due." (*Xerox Corp.* v. *County of Harris* (1982) 459 U.S. 145, 150 [74 L.Ed.2d 323, 328, 103 S.Ct. 523].)

The Warehousing Act of 1946, the precursor to the present statutes, "stimulated foreign commerce by allowing goods in transit in foreign commerce to remain in secure storage, duty free, until they resumed their journey in export." (459 U.S. at p. 150 [74 L.Ed.2d at p. 328].)

". . . Congress created secure and duty-free enclaves under federal control in order to encourage merchants here and abroad to make use of American ports. The question is whether it would be compatible with the comprehensive scheme Congress enacted to effect these goals if the states were free to tax such goods while they were lodged temporarily in Government-regulated bonded storage in this country." (459 U.S. at p. 151 [74 L.Ed.2d at pp. 328-329].)

Another central purpose of the customs-bonded warehouse is to guarantee that the federal government can collect its federal customs duties. (*R. J. Reynolds Tobacco Co.* v. *Durham County* (1986) 479 U.S. 130, 148 [93 L.Ed.2d 444, 466-467, 107 S.Ct. 499].) However, the Supreme Court has made it clear that customs-bonded warehouses are not exempt from all taxation.

In *Reynolds*, the Supreme Court stated, ". . . the current regulations [regarding customs-bonded warehouses] . . . appear to contemplate some

concurrent state regulation and, arguably, even state taxation." (479 U.S. at p. 149 [93 L.Ed.2d at p. 467].) "For example, an applicant for the proprietorship of a bonded warehouse must estimate the 'maximum duties and taxes' that will be due on goods stored therein at any one time. 19 CFR, § 19.2(a) (1986). Under this regulation, state taxation is entirely consistent with the supervisory control over stored goods exercised by customs officers. Pursuant to § 19.7, moreover, warehoused goods shall be 'liable for the expenses of labor and storage . . . and for all other expenses accruing upon the goods.' Expenses might be read here to include state ad valorem property taxes." (*Id.* at p. 149, fn. 19 [93 L.Ed.2d at p. 467].)

In *Itel Containers* v. *Huddleston* (1993) 507 U.S. ___ [122 L.Ed.2d 421, 113 S.Ct. 1095], the Supreme Court held that a state sales tax on leases of cargo containers for use exclusively in international shipping was not preempted by any federal regulatory scheme.

In that case, the court discussed customs-bonded warehouses and stated: ". . . we have not held that state taxation of goods in bonded warehouses is pre-empted by Congress' intent to occupy the field of bonded warehouse regulation. In fact, in *R. J. Reynolds* we specifically held that the bonded warehouse statutes and regulations did not evidence such a purpose. 479 U.S. at 149 [93 L.Ed.2d at p. 467]. So, too, we cannot conclude that in adopting laws governing the importation of containers Congress intended to foreclose any and all concurrent state regulation or taxation of containers." (507 U.S. at p. ___ [122 L.Ed.2d at p. 434].)

In *Xerox Corp.* v. *County of Harris, supra,* 459 U.S. 145, the Supreme Court held that city and county ad valorem personal property taxes levied on copy machines stored in a customs-bonded warehouse in Houston were preempted by "Congress' comprehensive regulation of customs duties." (*Id.* at p. 154 [74 L.Ed.2d at pp. 330-331].) In that case, Xerox shipped machine parts manufactured in the United States to Mexico where the copiers were assembled. The copiers were transported to Houston by a customs-bonded trucking company and then stored separately until they were shipped to Latin America. None of the copiers were sold for domestic use.

The court found, inter alia, that the taxes were preempted because the "remission of duties benefited those shippers using American ports as transshipment centers," and the "state tax was large enough in each case to offset substantially the very benefits Congress intended to confer by remitting the duty." (459 U.S. at p. 153 [74 L.Ed.2d at p. 330].)

By contrast, in *R. J. Reynolds Tobacco Co.* v. *Durham County, supra,* 479 U.S. 130, the Supreme Court held that an ad valorem property tax on

tobacco stored in a customs-bonded warehouse was not preempted by federal statutes and regulations. In that case, R. J. Reynolds imported tobacco from foreign countries and stored it in customs-bonded warehouses for about two years for aging. All of the tobacco products were consumed in the United States and Reynolds paid the necessary customs-duties as the tobacco was withdrawn from the bonded warehouses.

The *Reynolds* case analyzed the issue under the rubric of preemption. First, the court pointed out that the holding of preemption in the *Xerox* case was limited to the facts presented in that case, that is, where the goods were intended for transshipment. (479 U.S. at p. 144 [93 L.Ed.2d at p. 464].)

Next, the *Reynolds* court stated that the *Xerox* court was concerned with whether the tax at issue would interfere with congressional objectives. The *Reynolds* court held that the tax on tobacco in that case would not interfere with such congressional objectives. "It is difficult, . . . to believe that the purposes in forming the customs-bonded warehouse scheme identified by the Court in *Xerox* would be disserved by the imposition of ad valorem property taxes on Reynolds' imported tobacco." (479 U.S. at p. 144 [93 L.Ed.2d at p. 464].)

 We find that the analysis and discussion in *Reynolds* rather than *Xerox* is more applicable to the factual situation in our case because imposition of City's gross receipts and payroll taxes will not interfere with the congressional objectives behind customs-bonded warehouses, and Marine has not shown otherwise.

First, the tax in *Xerox* was an ad valorem tax levied on *goods* stored in a customs-bonded warehouse and destined for foreign commerce. In our case, by contrast, the City's gross receipts tax is levied on the *entity*, Marine and its operations, not the stored goods. Second, the goods (liquor, beer, tobacco and soft drinks), unlike the machinery in *Xerox* being sent to Mexico and South America, are not exports because they are consumed on the ship's voyage or the airplane's flight and are not destined for a foreign country. In *Shell Oil Co.* v. *State Bd. of Equal.* (1966) 64 Cal.2d 713, 718-719 [51 Cal.Rptr. 524, 414 P.2d 820], the California Supreme Court decided that bunker fuel oil, sold to vessels for consumption on their way to foreign ports and utilized during the voyage, was not an export because it was not destined for a foreign country. It was not enough that the fuel was carried out of the United States, nor that the fuel would never return.

That is also true in our case. The liquor, tobacco and soft drinks are simply carried out of the United States, but they are not destined for a foreign country because they are consumed on the flight or voyage.

Finally, the *Reynolds* court observed that the customs-bonded warehouse system assisted certain classes of importers by allowing them flexibility and thus encouraged the use of American ports. Prior to the Warehousing Act, an importer had to pay the duty in cash when the goods were unloaded from the vessel. The original Warehousing Act allowed an importer to defer paying duty for a certain period of time or to avoid taxes altogether if the goods were reexported. This allowed the importer the flexibility to sell his goods domestically or to "return them to foreign commerce" without having to prepay the duty. (*R. J. Reynolds Tobacco Co.* v. *Durham County, supra*, 479 U.S. at p. 147 [93 L.Ed.2d at p. 466].) The court concluded that the ad valorem tax at issue would not affect Reynolds's flexibility because the tobacco was only sold in domestic markets. Thus, Reynolds never had to decide whether to sell to domestic or foreign markets. (*Id.* at p. 148 [93 L.Ed.2d at pp. 466-467].)

This analysis also applies to the case before us because Marine only sells its products to airlines or cruise ships for international consumption. It has no domestic market. It has no need for the flexibility provided by the customs-bonded warehouses and thus it is not within that class of importers the customs-bonded warehouses were meant to assist.

The City is not preempted from assessing a gross receipts or payroll expenses tax on Marine. Federal preemption of the municipal business taxation scheme would not further the policies behind congressional regulation of customs-bonded warehouses.

2. *The Taxes Do Not Violate the Import-export Clause*[3]

In *Michelin Tire Corp.* v. *Wages* (1976) 423 U.S. 276 [46 L.Ed.2d 495, 96 S.Ct. 535], the Supreme Court "adopted a fundamentally different approach to cases claiming the protection of the Import-Export Clause." (*Limbach* v. *Hoover & Allison Co.* (1984) 466 U.S. 353, 359 [80 L.Ed.2d 356, 362-363, 104 S.Ct. 1837].)

In *Michelin*, the court "specifically abandoned the concept that the Import-Export Clause constituted a broad prohibition against all forms of state taxation that fell on imports. *Michelin* changed the focus of Import-Export

---

[3]The import-export clause states: "No state shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws . . . ." (U.S. Const., art. I, § 10, cl. 2.)

Clause cases from the nature of the goods as imports to the nature of the tax at issue. The new focus is not on whether the goods have lost their status as imports but is, instead, on whether the tax sought to be imposed is an 'Impost or Duty.' " (466 U.S. at p. 360 [80 L.Ed.2d at p. 363].)

In *Michelin*, the court held that a "nondiscriminatory ad valorem property tax, which had been assessed upon imported tires and tubes stored in a warehouse, was not the kind of tax prohibited by the Import-Export Clause, inasmuch as it did not offend the policies behind the Clause: concern that an impost or duty might interfere with the Federal Government's regulation of commercial relations with foreign governments; fear that on account of such state taxation the Federal Government would lose an important source of revenue; and a desire to maintain harmony among the States, which would be disturbed if seaboard States could tax goods 'merely flowing through their ports' to other States not so favorably situated." (*R. J. Reynolds Tobacco Co.* v. *Durham County, supra*, 479 U.S. at p. 153 [93 L.Ed.2d at pp. 469-470].)

In both *Michelin* and *Reynolds* the court found that a nondiscriminatory ad valorem tax did not offend the import-export clause.

The tax did not interfere with the federal government's regulation of foreign commerce because they were assessed both on imported and domestic goods. Further, the tax did not interfere with the collection of customs duties and thus they did not interfere with the federal government's revenue. Taxation was merely a means by which the state could allocate the cost of governmental services such as police and fire protection to the recipients of those services. Finally, it was not the kind of "seaboard" tax which the import-export clause sought to prevent. Rather, it was a tax imposed by the seaboard state in return for municipal services, and if the tax was not imposed it would require other taxpayers to subsidize Michelin, R. J. Reynolds and their ultimate consumers. (*Michelin Tire Corp.* v. *Wages, supra*, 423 U.S. at pp. 285-289 [46 L.Ed.2d at pp. 503-506]; *R. J. Reynolds Tobacco Co.* v. *Durham County, supra*, 479 U.S. at pp. 153-154 [93 L.Ed.2d at pp. 469-471].)

We apply the same analysis to the City's gross receipts and payroll tax now before this court. The taxes are imposed on all entities doing business within the City. The City does not single out imported goods for taxation and does not single out those businesses handling imported goods. Thus the taxes do not interfere with the government's right to regulate foreign commerce.

The taxes do not interfere with the federal government's collection of its revenue because they do not inhibit the collection of customs duties. Finally, these taxes are not imposed by the City because of its location on the coast. Rather, these are taxes levied on all businesses to pay for services provided by the City.

The court in *Reynolds* went so far as to state that failure to assess the tax would shift the tax burden from *Reynolds* and its customers to the other taxpayers of North Carolina. That is exactly what would happen in the case before us. If Marine is somehow exempt from paying this gross receipts and payroll tax, it will still benefit from City services it now receives. The only difference is that the other City taxpayers will be subsidizing the payment of the taxes.

Tennessee's sales tax on cargo containers used in international trade recently withstood a challenge under the import-export clause. In upholding the validity of the tax, the Supreme Court stated: "[T]he tax here is not a tax on importation or imported goods, but a tax on a business transaction occurring within the taxing State. The tax does not draw revenue from the importation process and so does not divert import revenue from the Federal Government. . . . The tax thus does not divert import revenue from the Federal Government because 'the taxation falls upon a service distinct from [import] goods and their value.' [Citations.]" (*Itel Containers* v. *Huddleston, supra,* 507 U.S. at p. __ [122 L.Ed.2d at pp. 438-439].)

In *Blue Star Line, Inc.* v. *City and County of San Francisco* (1978) 77 Cal.App.3d 429 [143 Cal.Rptr. 647], the court upheld a City payroll tax on (1) steamship lines which were non-United States registered, (2) steamship agents, and (3) stevedore firms whose employees loaded and unloaded cargo from the ships. The taxpayers contended, inter alia, that the tax violated the import-export clause. The court observed that in *Canton R. Co.* v. *Rogan* (1951) 340 U.S. 511, 513-515 [95 L.Ed. 488, 492-493, 71 S.Ct. 447, 20 A.L.R.2d 145], the Supreme Court held that "the import-export clause does not bar a local tax which reaches only the dockside 'handling' of articles in the flow of maritime importation or exportation, and is not levied upon the articles themselves: 'The difference is that . . . the tax is not on the *goods* but on the *handling* of them at the port.' [Citations.]" (77 Cal.App.3d at p. 438.)

The *Blue Star Line* court adopted this view and found that "[r]espondent's payroll tax reaches only the dockside 'handling' of imported and exported

articles by employees of the stevedore firms, and it falls even further away from the articles insofar as it reaches the San Francisco activities of the steamship lines' owner's representatives and the employees of the steamship agents. Because it does not reach the articles themselves, the import-export clause does not invalidate its levy upon appellants' payrolls. [Citation.]" (77 Cal.App.3d at p. 439.)

The *Blue Star Line* case is very similar to the case before us because they both concern a payroll tax on activities and goods connected with foreign commerce.[4] Since the City taxes only the gross receipts and payroll expenses of Marine's business operations and levies no tax on the liquor, tobacco or soft drinks, it does not violate the import-export clause. (See 77 Cal.App.3d at p. 439.)

3. *There Is No Violation of the Commerce Clause*[5]

■ Marine's argument that the City's tax violates the commerce clause lacks merit.

In *Complete Auto Transit, Inc.* v. *Brady* (1977) 430 U.S. 274 [51 L.Ed.2d 326, 97 S.Ct. 1076], the Supreme Court established factors to determine whether a local tax is prohibited by the commerce clause. The tax will be approved "when the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce and is fairly related to the services provided by the State." (*Id.* at p. 279 [51 L.Ed.2d at p. 331].)

The taxes at issue in this case meet the requirements of *Complete Auto Transit.* Marine has a nexus with the City of Los Angeles because its business operation is located in the City and it receives City services such as police and fire protection. The tax is apportioned because it is only assessed on gross receipts and payroll expenses generated within the City. The tax is not discriminatory because it is assessed against all such business located within the City. Finally, the tax helps pay for, and is related to the services provided by the City, and Marine receives the benefit of police, fire and other City services.

---

[4]Marine tries to distinguish *Blue Star* on the ground that it does not concern customs-bonded warehouses like the *Xerox* case, but as this court has discussed, the taxes in question in this case do not interfere with any of the policies behind the customs-bonded warehouses.

[5]The commerce clause states Congress shall have the power "[t]o regulate commerce with foreign nations, and among the several states . . . ." (U.S. Const., art. I, § 8, cl. 3.)

A business which is engaged in interstate commerce must "pay its just share of the cost of [local] government upon which [it] necessarily relies and by which it is furnished protection and benefits." (*Colonial Pipeline Co.* v. *Traigle* (1975) 421 U.S. 100, 114 [44 L.Ed.2d 1, 12, 95 S.Ct. 1538].)

## DISPOSITION

The judgment is affirmed. Each party to bear its own costs.

Klein, P. J., and Croskey, J., concurred.